(Reap. Dec. 11095)

A. ZERKOWITZ & CO., INC. *v.* UNITED STATES

Entry No. 961416, etc.

(Decided October 27, 1965)

*Sharretts, Paley & Carter* (*Howard Clare Carter, Eugene F. Blauvelt,* and *Gail T. Cumins* of counsel) for the plaintiff.

*John W. Douglas,* Assistant Attorney General (*Samuel D. Spector* trial attorney), for the defendant.

*Lamb & Lerch* (*David A. Golden* of counsel) as *amicus curiae.*

NICHOLS, Judge: The merchandise involved in these appeals, consolidated at the trial, consists of footwear with cotton canvas uppers and with soles in chief value of rubber or substitutes for rubber, imported from Japan during the years 1958, 1959, and 1960. In accordance with Presidential Proclamation No. 2027, dated February 1, 1933, 63 Treas. Dec. 232, T.D. 46158, and in view of the fact that this merchandise was included in the final list published by the Secretary of the Treasury, 70 Stat. 948, 93 Treas. Dec. 14, T.D. 54521, pursuant to the Customs Simplification Act of 1956, it was appraised on the basis of the American selling price, as defined in section 402a (g) of the Tariff Act of 1930, as amended by said Customs Simplification Act. It is claimed that the proper basis of appraisement is export

value, as that value is defined in section 402a(d) of said tariff act, as amended.

This case was originally tried and submitted before the late Judge Mollison in 1961. By order, dated February 15, 1962, he set aside the submission and restored the case to the calendar. *A. Zerkowitz & Co. Inc.* v. *United States*, 48 Cust. Ct. 559, Reap. Dec. 10175. In his memorandum, he noted that the proof offered by the plaintiff was directed toward establishing that the "Rover" tennis oxford, selected by the appraiser as the domestic article whose selling price should be taken as the value of the imported article, was not like or similar thereto. He then stated (pp. 561–562):

> Even were the court to find that the "Rover" tennis oxford was not like or similar to the imported footwear, or that the conditions under which it was offered and sold did not conform to the terms of the American selling price statute, such a finding would not automatically establish that the Presidential proclamation was inapplicable to the valuation of the merchandise. The imported merchandise is of the description of that covered by the proclamation, requiring such merchandise to be appraised on the basis of American selling price. As has been said, to eliminate the imported merchandise from the purview of the proclamation, proof (or a substitute therefor) would have to be adduced [by plaintiff] that no other domestic article to which the imported article was like or similar existed at the pertinent times, or, if such an article existed, that its price did not reflect the terms and conditions of the American selling price formula.

> &ast;      &ast;      &ast;      &ast;      &ast;      &ast;      &ast;

> Moreover, the court observes that, even if it were found that the Presidential proclamation was inapplicable to the valuation of the merchandise at bar, the record does not establish the correct basis of value applicable thereto.

Thereafter, much additional evidence was presented at hearings at various ports and the case was submitted before me on October 16, 1964.

Presidential Proclamation No. 2027, *supra*, covers footwear subject to duty under paragraph 1530(e) of the Tariff Act of 1930, and provides in part:

> &ast; &ast; &ast; that the rate of duty shown by said investigation to be necessary to equalize such differences, within the limit provided in said section 336, on boots, shoes, or other footwear (including athletic or sporting boots and shoes), the uppers of which are composed wholly or in chief value of wool, cotton, ramie, animal hair, fiber, rayon or other synthetic textile, silk, or substitutes for any of the foregoing, with soles composed wholly or in chief value of india rubber or substitutes for rubber, is 35 per centum ad valorem based upon the American selling price as defined in section 402(g) of said act of boots, shoes, or other footwear (including athletic or sporting boots and shoes), the uppers of which are composed wholly or in chief value of wool, cotton, ramie, animal hair, fiber, rayon or other synthetic textile, silk, or substitutes for any of the foregoing, with soles composed wholly or in chief value of india rubber or substitutes for rubber, manufactured or produced in the United States; &ast; &ast; &ast;.

The first claim made by the plaintiff is that this proclamation was rendered inoperative by the later modification of paragraph 1530(e) by the Protocol of Terms of Accession by Japan to the General Agreement on Tariffs and Trade, T.D. 53865 (hereinafter referred to as the Japanese Trade Agreement). Said proclamation had been issued under the authority of section 336 of the Tariff Act of 1930, and no claim is made that it was not authorized by the statute or that it was not in effect before the Japanese Trade Agreement, which was made in 1955. What is claimed is that it became inoperative when that agreement became effective, because of the following language in section 350(a) 2(a) of the Tariff Act of 1930 (19 USC § 1352):

* * * The provisions of sections 336 and 516(b) of the Tariff Act of 1930 shall not apply to any article with respect to the importation of which into the United States a foreign-trade agreement has been concluded pursuant to this act, or to any provision of any such agreement. * * *[1]

Plaintiff construes this section not only as prohibiting the initiation of section 336 proceedings as to any article covered by a future trade agreement but as relating back to any Presidential proclamation already in effect under section 336, and rendering it inoperative whenever a trade agreement should thereafter include an article embraced by such proclamation.

If one ignored all that had happened respecting the employment of American selling price valuation for rubber-soled footwear in the last 30 years, the argument might, by one inclined to generosity, be called plausible.

In *Albert F. Maurer Co.* v. *United States*, 47 Cust. Ct. 560, Reap. Dec. 10130, affirmed 50 Cust. Ct. 539, A.R.D. 153, affirmed 51 CCPA 114, C.A.D. 845, there were involved rubber overshoes covered by foreign trade agreements but appraised on the basis of the American selling price. Judge Donlon noted section 350(a) 2(a), *supra*, and stated (p. 575):

Rubber overshoes are included in such foreign trade agreements. Counsel raise no issue as to the above provision, either in their statements to the court or in their briefs. This is doubtless because the authority to conclude foreign trade agreements is prospective in its impact on section 336. The Presidential proclamation, under which these rubbers were appraised, antedates the enactment of section 350(a).

This has resulted in the continuing valuation of imported merchandise, notwithstanding trade agreements, on the basis of competitive conditions that were found to exist over three decades ago. Whether Czechoslovakia is any longer the "principal competing country" producing rubber overshoes, it is not our province to consider. One consequence of what may be an inequity, due to elapse of a considerable period of time and change in competitive conditions, has been the substantial increase in litigation before this court, challenging appraisements

---

[1] Said section was later amended to delete reference to section 516(b), 65 Stat. 72, 75.

that are being made on the basis of American selling price pursuant to long ago Presidential proclamations. Whether or not there is such inequity, is a political issue that only Congress can decide. It is not an issue appropriate for court decision.

Whether American selling price appraisement is desirable as a matter of trade policy (and whether it should be permanently employed on the basis of possibly ephemeral conditions) are not for this court, and counsel in their briefs have properly not discussed any such questions. The law prescribes such appraisement under certain circumstances, and the duty of this court is solely to determine if the circumstances exist, applying the law according to the facts and the intent of the lawmaker. The decision herein undertakes to do this.

The broad purpose of the Trade Agreements Act of 1934 and its subsequent extensions (section 350(a) of the Tariff Act of 1930, as amended, 19 USC § 1351, as amended) was to expand the foreign trade of the United States by permitting the President to enter into reciprocal trade agreements with other nations by which existing duties or import restrictions would be modified within the limits provided. *Star-Kist Foods, Inc.* v. *United States (Bruno Scheidt, Inc., Party in Interest)*, 47 CCPA 52, C.A.D. 728. Section 350(a) 2(a) was included in order that trade agreement concessions might not be nullified through the procedure provided in section 336. Existing proclamations would not have this effect since they would be known to the parties when trade agreements were negotiated and conditions under them would be the basis of negotiation. Where a rate of duty has been increased by a Presidential proclamation under section 336, it may be reduced by a trade agreement entered into under the authority of section 350(a), but if the trade agreement is terminated, the rate of duty reverts to that provided for in the Presidential proclamation. *Barclay & Company, Inc.* v. *United States*, 47 CCPA 133, C.A.D. 745. The section 336 proclamation is not abrogated by the trade agreement or the proclamation proclaiming it, but is merely suspended.

Here, the parties to the involved trade agreement, not only knew about the Presidential proclamation, but considered it still in force and still requiring appraisement to be on the basis of American selling price. Paragraph 1530(e), as modified by the Japanese Trade Agreement, provides:

Boots, shoes, or other footwear (including athletic or sporting boots and shoes), the uppers of which are composed wholly or in chief value of wool, cotton, ramie, animal hair, fiber, rayon or other synthetic textile, silk, or substitutes for any of the foregoing:

With soles wholly or in chief value of india rubber or substitutes for rubber_____ 20% ad val.

NOTE: The duty on the foregoing articles is to be calculated on the basis specified in T.D. 46158.

If the basis of appraisement made effective by Presidential Proclamation No. 2027 might have been changed by following the procedure provided for in section 336(f), this has not been done. Whether or not the President could have made such a change by means of a trade agreement need not here be determined. His authority under the Trade Agreements Act, as amended (19 USC § 1351), grants him power:

(a) * * *
  (1) * * *
    (A) * * *
    (B)   To proclaim such modifications of existing duties and other import restrictions, or such additional import restrictions, or such continuance, and for such minimum periods, of existing customs or excise treatment of any article covered by foreign trade agreements, as are required or appropriate to carry out any foreign trade agreement that the President has entered into hereunder.

    (2) No proclamation pursuant to paragraph (1)(B) of this subsection shall be made

      *      *      *      *      *      *      *

    (C)   In order to carry out a foreign trade agreement entered into by the President before June 12, 1955, or with respect to which notice of intention to negotiate was published in the Federal Register on November 16, 1954, decreasing by more than 50 per centum any rate of duty existing on January 1, 1945.

      *      *      *      *      *      *      *

It would, however, be surprising for a President to effect such a change without notice; or with notice that such a change had not been made. Whatever changes he makes, he must "proclaim." If the modification to paragraph 1530(e) by the Japanese Trade Agreement is construed to make a change in the basis of appraisement as well as to reduce the rate of duty, the total reduction might be beyond the limits allowed to the President under the above section. No President, we are sure, has been or will be so poorly advised as to do such a thing by inadvertence.

The Congress twice amended paragraph 1530(e), in 1954 (68 Stat. 454) and in 1958 (72 Stat. 185). Both were for the purpose of closing loopholes through which importers were avoiding American selling price appraisement, or so it was thought. For one example of such avoidance, cf. A. Zerkowitz & Co., Inc. v. United States, 54 Cust. Ct. 151, C.D. 2525, appeal dismissed August 4, 1965. In the 1954 amendment, the Congress said: "For the purposes of this paragraph and any existing or future proclamation of the President relating thereto * * *." There can be no doubt that this amounted to a congressional adoption and ratification of Presidential Proclamation No. 2027, supra, when it is considered with the context and purpose of the

amendment. The reports show that the 1958 amendment was predicated on congressional awareness that the American selling price appraisement had not been broken off by the Japanese Trade Agreement of 1955, but remained effective in practice, except for the loopholes the Congress sought to close. Report of Ways and Means Committee to accompany the bill (H.R. 9291), T.D. 54659; Report of the Senate Finance Committee, United States Code Congressional and Administrative News, volume 2, 85th Congress, page 2635. These reports point out that, subsequent to the Japanese Trade Agreement, importers have been avoiding the appraisement of rubber-soled footwear on the basis of American selling price by adding pieces of material to make the footwear in chief value of leather or the uppers in chief value of leather. The purpose of the proposed amendment was stated to be to define further the footwear covered by paragraph 1530(e), which was subject to duty at ad valorem rates based on the American selling price of the domestic article.

In the Tariff Classification Study made pursuant to title I of the Customs Simplification Act of 1954, it is noted that the Presidential proclamation issued under section 336 gave increased tariff protection to rubber footwear by changing the basis of valuation to the American selling price. Tariff Classification Study, November 1960, schedule 7, page 18. The study also stated:

So far as is known to the Commission almost all the products of the rubber footwear industry were until recent years of a kind covered by the increased tariff protection afforded by the above-mentioned proclamation under section 336. In recent years, however, there have been imports of footwear which have the appearance and are in fact of a kind made by the domestic rubber footwear industry, but which, by some relatively minor change in construction, have avoided classification for duty purposes under the tariff provisions established by the 1933 proclamation. The Congress has twice enacted legislation "to close a loophole in the tariff laws by which foreign producers are, by artful manipulation of a product, avoiding an import duty imposed specifically for the protection of the domestic rubber-soled footwear industry."

While the footwear provisions in the Tariff Schedules of the United States are different, some items are still subject to appraisement on the basis of American selling price. See schedule 7, part 1, subpart A, headnote 3(b):

Subject to the provisions of section 336(f) of this Act, the merchandise in item 700.50, if the rubber portion thereof is wholly, or over 50 percent by weight, of natural rubber, and in item 700.60 shall be subject to duty upon the basis of the American selling price, as defined in section 402 or 402a of this Act, of like or similar articles manufactured or produced in the United States.

The unbroken practice of the Executive, the Congress, and our court, are contradicted only by plaintiff's debatable grammatical construction. I conclude that Presidential Proclamation No. 2027 has not been abrogated or suspended and that, if such as the instant merchandise

was ever covered thereby, it was still subject to appraisement on the basis of the American selling price on the date of importation.

Although the proclamation is in broad language covering all of a general class or type of shoe (footwear with uppers of wool, cotton, or other textile and soles of rubber or rubber substitutes), the language of section 336 indicates there must be, and courts determine whether there is, a "like or similar" domestic shoe which is "competitive" with the imported article, in order for the proclamation to apply. *H. H. MacDonaugh & Co. and The Mutual Supply Co.* v. *United States*, 38 CCPA 36, C.A.D. 436; *Mutual Supply Co.* v. *United States*, 5 Cust. Ct. 614, Reap. Dec. 5062; *K. Samura Shoten, Ltd.* v. *United States*, 1 Cust. Ct. 713, Reap. Dec. 4437; *United States* v. *Japan Import Co., Inc.*, 2 Cust. Ct. 926, Reap. Dec. 4568; *Geo. S. Bush & Co., Inc.* v. *United States*, 43 Cust. 577, Reap. Dec. 9563, affirmed 46 Cust. Ct. 754, A.R.D. 126; *Albert F. Maurer Co.* v. *United States, supra*. In the case last cited, the court of appeals noted that the true question was whether, in order to carry out the intent of Congress, it should be held that the foreign and domestic rubbers there involved were legally "similar," notwithstanding their differences. It added (p. 119):

* * * If the collector can find no American article sufficiently similar to the one imported to create market competition with it, obviously no one is going to be disadvantaged, there is no point in applying the proclamation, and as a matter of law it would not apply. On the other hand, where imports are sufficiently similar to American goods to compete directly with them, and the goods are within a category named in the proclamation, it would seem to be within the intent of Congress that they receive the protection the proclamation was intended to afford. The whole scheme was to protect specified American manufacturers whenever and if foreign competing merchandise came in by charging the latter with an ad valorem duty based on American selling price of the American-made protected articles, in the words of the statute itself, in order to "equalize the differences in the costs of production of the domestic article and the like or similar foreign article * * *."

Some items of footware have been held not subject to appraisement on the basis of American selling price, on the ground that the domestic shoe was not "like or similar": Rubber-soled cotton socks, called tabis; rubber-soled oxfords with toyo paper uppers which became separated from the soles when wet, so that they were incapable of the same use as the domestic shoes; rubber-soled shoes with cotton uppers used for farm work. *K. Samura Shoten, Ltd.* v. *United States, supra; United States* v. *Japan Import Co., Inc., supra; Mutual Supply Co.* v. *United States, supra,* respectively. In the toyo paper case (*Japan Import, supra*), the shoes were unmerchantable, 90 per centum being returned by the buyers. Whether the case should be followed with respect to a merchantable shoe may be considered open. On the other hand, a number of rubber-soled shoes with canvas uppers have been held like or similar to domestic articles. *Japan Import Co.* v. *United*

*States*, 24 CCPA 167, T.D. 48642; *H. H. MacDonaugh & Co. and The Mutual Supply Co.* v. *United States, supra; Stanley Weiner* v. *United States*, 51 Cust. Ct. 353, Reap. Dec. 10572, rehearing denied, 51 Cust. Ct. 419, Reap. Dec. 10599. In *Albert F. Maurer Co.* v. *United States, supra*, domestic and imported rubbers were held to be similar.

It has also been held that where there is a "like" domestic article, its selling price must be used in preference to that of a "similar" domestic article. *Hoyt, Shepston & Sciaroni* v. *United States*, 38 Cust. Ct. 741, A.R.D. 74, appeal dismissed 45 CCPA 129; *Geo. S. Bush & Co., Inc.* v. *United States*, 48 Cust. Ct. 689, A.R.D. 140, appeal dismissed 49 CCPA 139.

The remaining issues here are (1) whether the U.S. Keds "Rover" used by the appraiser as the domestic article whose price represented the American selling price is like or similar to the imported article; (2) whether the selling price of the U.S. Keds "Rover" reflected the terms and conditions of the American selling price formula, and, if not, (3) whether any domestic shoe like or similar to the imported merchandise existed, and whether its price reflected the terms and conditions of the American selling price formula.

Whether or not items of foreign and domestic footwear are "like or similar" have been before the courts on a number of occasions and guidelines have been indicated for the determination of the question.

In *Japan Import Co.* v. *United States, supra*, in finding the domestic and the imported articles similar, the court stated (pp. 174–175):

* * * The testimony shows that the imported shoes sold variously from 35 cents to 50 cents a pair at wholesale. The usual price for the domestic shoes, at the time of importation, was approximately 69 cents a pair wholesale. Some testimony was offered to the effect that the domestic product in some cases was of a better quality than the imported shoes; for instance, some of these domestic articles were said to have a cloth upper which permitted the passage of air, thus ventilating the shoe. The insoles were said to be closer fitting and the cross corrugations on the soles of better quality. It was also claimed that the soles of some of the domestic shoes were more flexible. The evidence, however, did show that the imported shoes and the domestic shoes were sold in the same establishments, to the same class of customers, and were adapted for the same uses and purposes. The witnesses differed to some degree as to whether they considered the imported and domestic shoes to be similar, some expressing the opinion definitely that they were similar for selling purposes, while others had the contrary opinion.

On the other hand, the shoes in *Mutual Supply Co.* v. *United States, supra*, were found to be dissimilar because not commercially interchangeable, not sold in the same stores, not used by the same class of people, and not of the same quality, and because one was adapted for use by farmers and the other not.

In *Albert F. Maurer Co.* v. *United States, supra*, the domestic and foreign rubbers differed in numerous mechanical and functional de-

tails, such as weight, hardness, anti-skid force, holding properties, and lip opening. The foreign article was in a "modern" design, whereas the domestic rubber had an entirely conventional appearance. The court noted that a purchaser who had decided on one might not be satisfied with the other but that both served the same purpose, to keep the feet dry. They were made of substantially the same material and were flexible enough to stuff in a case or pocket. The difference in hardness would not be apparent to the average customer. They were held to be "similar," notwithstanding their differences.

In the instant case, samples of the imported shoe (plaintiff's exhibit 9) and of the U.S. Keds "Rover" (plaintiff's exhibit 6, hereinafter called the Rover) have been received in evidence. Both are of the type commonly known as tennis oxfords or sneakers. According to one witness, canvas upper shoes are called tennis shoes by the manufacturer because they are made by tennis manufacturing methods. The Rover was more particularly described as a circular vamp oxford. In appearance, the two samples are very similar. Both have colored canvas uppers and rubber or composition rubber soles. The chief apparent difference is that the Rover has a flat "pebbled" sole, whereas the imported shoe has a "checkerboard" sole and a "ridged" heel, and is more flexible.

The plaintiff had tests made of the imported shoe and the Rover by the United States Testing Co., the results of which appear in the testimony of Paul S. Marois, textile engineer, and in plaintiff's exhibit 1. They show that there were differences in construction in the two shoes; that the imported shoe was more skid-resistant, but the Rover had a higher resistance to wear and was stronger in other respects. The witness testified that if the construction features of the domestic article were assigned an arbitrary numerical value of 100, then a value of 70 should be assigned to the construction features of the imported article.

The sole of the imported shoe was designed to be skid-proof and for wearing on asphalt and concrete and the design had been patented. There was testimony that similar designs were used on soles and heels of domestic canvas top, rubber-soled oxfords and that, as long as the surface was broken, they were skid-resistant. According to one witness, the pebble-type sole also has nonskid features but it is not as nonskid as a sole with ridges. There was no clear showing that either shoe is better than the other in this regard, or that many purchasers would accept one shoe and reject the other, on account of the difference.

Mr. Zerkowitz testified:

Exhibit 9 is a cheap shoe without any cushion insole, without any arch support, not suitable for people who are accustomed to wear shoes with cushion insole and with arch support.

However, exhibit 9 itself contains the words "Built-in-Arch" on the insole. One witness said this exhibit had a "simulated support."

Other witnesses for plaintiff testified that the sole of the imported shoe was thinner; that the canvas was of a lighter, cheaper kind; that the shoe did not have the same cushioning and arch features as the Rover; and that it was of inferior quality. Witnesses in the shoe business testified that exhibit 9 would not be a valid replacement for exhibit 6, because it was of inferior quality and would have to be sold at a lower price.

Defendant's witness, Harold N. Barrett, vice president and general manager of the Footwear & General Products Division of the United States Rubber Co., testified as to the differences and similarities of the two articles:

> Well, they're both made with what we call enameling duck uppers. They're both backed with a twill backing. I wouldn't be able to tell you the exact weight without an analysis of them, but they are very similar as regards the count, from a visual appearance. They both have hard insoles; they both have the same type outsoles, rubber-compounded outsoles. They both have foxing. They are made with three-piece uppers. They each have a vamp to quarter. They're stitched up the back by the very same methods of stitching. They both have counters in them; they both have counter binds. They have eyelets. This little one happens to have one less eyelet, but they do have eyelets. They both have laces. In fact, they are the same as each other. They are very similar.

Abraham Alexander, customs examiner of footwear before his retirement, testified that the articles were made of similar material and had calendered rubber soles of different design. The testimony of James H. Hanson of the United States Rubber Co. is to the same effect.

There was evidence that exhibit 9 would not be permitted on grass, clay, or composition tennis courts, but that exhibit 6 would be permitted on composition courts. A witness testified, however, that there is great disparity around the country as to what type of shoe is allowed on what kind of court, and another that "tennis shoe" is a "generic or misnomer term," by which he meant, apparently, that the chief use is not for playing tennis. There was evidence of other patterns specially designed for that.

The test laid down in *United States* v. *Wecker & Co.*, 16 Ct. Cust. Appls. 220, 225, T.D. 42837, is as follows:

> The individual differences between the foreign-market products and those imported in texture, workmanship, or structure might not be, in themselves, sufficient to prevent the goods from being similar. * * * The question of similarity is, in each case, to be measured by much the same homely rule that applies to the prospective customer who enters a store seeking some utilitarian article of a certain specified name and style; he finds the article requested is not in stock but that another article, of approximately the same price and which will perform the same functions is capable of the same use and may be substituted

therefor, is available. Such an article is a similar article, notwithstanding the price, the methods of construction, and the component materials may be somewhat different; but, for all utilitarian purposes, one is a substitute for the other. * * *

This case did not involve American selling price valuation, but the above language has been quoted in cases that did. *Mutual Supply Co. v. United States*, 38 CCPA 44, 47, C.A.D. 437; *Albert F. Maurer Co. v. United States, supra* (47 Cust. Ct. at pp. 573–574).

The dissimilarities relied on by plaintiff herein, may be stated to be the differences in (a) price, (b) quality, (c) advertising, and (d) retail sales outlets employed. I take them up in order.

(a) Price. The imports sold at prices ranging from 60 cents to $1.15 per pair, whereas the Rover sold for prices ranging from $2.05 to $2.65 per pair. Several witnesses stated that because of the price differential, the two articles are sold to different types of customers. According to a marketing expert, Paul H. Nystrom, such articles occupy quite different fields; they may overlap a little but they do not compete. The price range between the import and the Rover is very wide, wider than in any reported case under the proclamation that I have noticed. However, as to price, the shoe selected as the United States counterpart is typical of the lowest price line of about 10 United States manufacturers. There can be no suggestion that a premium or luxury shoe was arbitrarily selected as a counterpart. Since no claim is made that the import was "dumped," it is to be presumed the price differences are due mainly to lower cost of production, to inferior quality, and to the import not being advertised, but what part of the difference may be assigned to each factor does not appear. The court declined to go into the actual advertising costs of the Rover. As to cost of production, considering, as I must, the purposes of the proclamation and the solicitude the Congress has displayed about it, it would certainly seem that the wider the difference in cost of production, the more the case is within the intent of the proclamation. Price differences due to quality differences and advertising are discussed under those headings.

(b) Quality. With respect to quality, the evidence was in conflict. Assuming, *arguendo*, that if the Rover is rated at 100, the import is 70, this would not prevent the import from offering highly effective competition when, as here, the price variation was, percentagewise, even greater. The samples, which are "potent witnesses" (*United States v. The Halle Bros. Co.*, 20 CCPA 219, T.D. 45995; *Marshall Field & Co. v. United States*, 45 CCPA 72, C.A.D. 676), tell us that to the untutored eye the shoes look much alike. Even to well-heeled buyers, the cheaper shoe with more frequent replacement would be an attractive proposition, particularly for growing children

and for uses which dirtied up the shoe rapidly. There was no really serious contention that for foot health, either shoe offered anything not offered by the other. Constant wear of either shoe by a person with arch trouble would hardly be advisable, one supposes. All things considered, I find that the inferiority of the import, if any, resides chiefly in lesser durability, and I do not believe that, for purposes of the proclamation, even a very much greater difference in durability than is here alleged would make the articles not "similar."

(c) Advertising. One of the important differences in the marketing of the two articles is that the Rover is one style in the line covered by the registered brand name "U.S. Keds," which is extensively advertised by the United States Rubber Co. Display exhibits advertising products bearing the "U.S. Keds" label were supplied by the United States Rubber Co. to its customers. On the other hand, the plaintiff did not advertise the imported shoe or supply exhibits or advertising material to its customers. The presence of an unknown advertising component in the producer's budget is not fatal to similitude. It is well known that large advertising expenses may make it possible to sell a product cheaper, because of larger production runs. Whether this is so in the case of the Rover, or partly so, or not so at all, we do not inquire, as it is a collateral issue; at any rate, a decision to advertise is made in the hope it will be so. Advertising is a natural and needed defense of the domestic producer against cheap competition, foreign and domestic. We frustrate the proclamation, in part, if we say that if an import is not advertised, a counterpart may be sought only among unadvertised domestic products; we withdraw protection from the producers who need it most.

Courts have frequently considered whether prices realized by branded merchandise may be used in the appraisement of otherwise similar unbranded counterparts. See *Chr. Bjelland & Co., Inc.* v. *United States*, 52 CCPA 38, C.A.D. 855; *Page & Jones, Inc., et al.* v. *United States*, 53 Cust. Ct. 363, Reap. Dec. 10788 (application for review pending), discussions therein, and cases cited. However, counsel have called attention to no such case involving use of the American selling price method, and I have found none. Cases under the other statutory valuation methods are not, I believe, controlling herein. Here, the issue is "one of economics, not semantics" (*Maurer, supra,* at p. 119), and, one may add, the intent of the Congress. The other valuation methods are formulae, to determine, within minor variations, the value of the merchandise under appraisement, using "similar" merchandise merely as a measure. There it would be a very serious question, to enhance the value of the import by reason of branding and advertising applicable to other products, from which it derives no benefit. But the American selling price method does not pretend to

determine the value of the import, either before or after importation. Often no willing buyer would pay, and no seller would have the face to demand, the "value" assigned an import by that formula. The import is "appraised" according to the value of something else, and thus, of necessity, the appraisal must often reflect elements of value of many kinds in which the import does not share. Plaintiff cannot complain of unfairness, for the Congress, which could have totally embargoed merchandise such as that before us, has instead elected merely to employ this method to make its importation financially onerous. See discussions in *Kuttroff*, *Pickhardt & Co.* v. *United States*, 12 Ct. Cust. Appls. 299, 302, T.D. 40313; *Japan Import Co.* v. *United States*, *supra*, at page 170.

(d) Retail outlets. The manufacturer sold the Rover directly to retail outlets, except in the case of two distributors through whom it sold to retailers in Norfolk, Va., and Sacramento, Calif. It did not, except for these two, as a matter of policy, seek to sell to jobbers, distributors, or discount houses. The retailers had "suggested" price-lists sent them, but were not required to sell at those prices or were otherwise restricted. Zerkowitz sold to wholesalers, jobbers, and discount houses, and the merchandise, it is claimed, reached the consumer through five and tens, discount houses, and bargain basements. There is evidence here that U.S. Keds and the imported merchandise were displayed and sold in some of the same stores and sold to any customers who came in, but there is also evidence that the imported merchandise was sold to a different class of customer; and that U.S. Keds were not sold to F. W. Woolworth, H. L. Green, J. C. Penney, the Newberry Stores, S. H. Kress, or E. J. Korvette or other discount houses, as the import was. The evidence does not establish, however, that the Rover and the import were never available in the same stores (one witness, a retailer, testified he sold both), and to prove such a thing even generally true would seem almost impossible, considering the multiplicity of retail outlets for rubber-soled, canvas upper footwear. The court does believe, and finds, that a larger portion of the imports reached the consumer through outlets, such as discount houses, that appealed to consumers primarily interested in the lowest price, than was the case with the Rover. It must be realized, however, that both shoes, much as they differ in price from one another, are at the lower end of the price range, if we consider all footwear, and the claimed durability of the Rover might appeal to many budget conscious persons. Some court decisions seem to say that a counterpart, to be competitive, must be sold through the same retail outlets. (*Mutual Supply Co.* v. *United States*, *supra*; *United States* v. *J. J. Boll et al.*, 53 Cust. Ct. 523, A.R.D. 179, appeal dismissed September 23, 1964.) It is easy to see that if an import was sold only in religious supply houses, and the alleged

counterpart only through sporting goods establishments, skepticism as to competitiveness would be warranted. When the outlets differ, however, primarily in the degree to which they cut prices, or claim they do, the difference in outlet is simply a function of the difference in price, and price is the life of competition. The Nieman Marcuses, Brooks Brothers, or Abercrombie & Fitches of this world would indeed be surprised to be told they received no competition from cheaper discount houses. No customer is so wealthy he does not look for a bargain once in a while. The finest stores (not those named above) run bargain basements and occasionally they announce sales, at which times, if rumor is correct, the high-quality merchandise may be secreted in the warehouses and poorer stuff finds its way to the counters. Occasionally, too, high-price stores dispose of slow-moving merchandise to lower price outlets. Not only is it impossible to find that the imports *never* competed with the alleged counterparts on the shelves of the same stores, but to the extent the competition was at a distance of around the corner, or from first floor to basement, it is impossible to see the relevance of the fact. Only one case has been found which refers to employment of different retail outlets as one—but only one—of the determinative factors in finding lack of similarity: *Mutual Supply Co.* v. *United States, supra,* in which the import was a shoe of peculiar design used in the United States only in the rural parts of California and only by Japanese and Philippine farm laborers. Therefore, naturally, it was sold only in Japanese stores, dry goods stores, and grocery stores, in the rural districts, where the domestic alleged counterparts were not sold. The facts in the instant case are entirely different. It is conceivable—though not this case—that an importer might find means of marketing his product through a retail chain that handled no domestic brand, but, even then, I question if such fact would compel a finding of absence of competition, and, therefore, of "similarity," if the domestic counterpart was otherwise alike.

The difference in price, relied on to establish dissimilarity, thus fail to do it. We do not find any decision of our appellate courts as saying that products are dissimilar under the laws here to be construed if the import is very much lower in price; if our own court has so stated, I believe it inadvertent, and for reasons already indicated, the proposition is absurd. To the extent the difference results from lower cost of production, this is the very case the proclamation is aimed at. To the extent it reflects poorer quality, not enough difference in quality is here shown to negative appeal of both products to the same buyers considering that the same buyer might accept a good product or a poorer product at a lower price. To the extent it reflects a different advertising policy, the purposes of the proclamation require that the

difference be allowed for. The difference in retail outlets is not conclusively established and is not relevant when, as here, such difference as exists is a function of the difference in price and does not reflect difference in end uses. Thus, the appraiser's finding that the Rover is similar to the import is not refuted and must stand.

The court must next find the American selling price of the Rover. *Kuttroff, Pickhardt & Co.* v. *United States*, 13 Ct. Cust. Appls. 17, 21, T.D. 40861. American selling price is defined in section 402a(g) of the Tariff Act of 1930, as amended, as follows:

(g) The American selling price of any article manufactured or produced in the United States shall be the price, including the cost of all containers and coverings of whatever nature and all other costs, charges, and expenses incident to placing the merchandise in condition packed ready for delivery, at which such article is freely offered for sale for domestic consumption to all purchasers in the principal market of the United States, in the ordinary course of trade and in the usual wholesale quantities in such market, or the price that the manufacturer, producer, or owner would have received or was willing to receive for such merchandise when sold for domestic consumption in the ordinary course of trade and in the usual wholesale quantities, at the time of exportation of the imported article.

Under this definition, American selling price may be determined in three ways: (1) By the price at which the domestic article is freely offered for sale to all purchasers in the principal market, in the ordinary course of trade and in the usual wholesale quantities, or, alternately, (2) by the price that the manufacturer, producer, or owner would have received, or (3) would have been willing to receive for such merchandise when sold in the domestic market in the ordinary course of trade and in the usual wholesale quantities. *Kuttroff, Pickhardt & Co.* v. *United State, supra; H. H. MacDonaugh & Co. and The Mutual Supply Co.* v. *United States, supra; Hudson Shipping Co., Inc.* v. *United States,* 43 CCPA 19, C.A.D. 604. In the case last cited, the court said (p. 30):

In this case, from the evidence introduced, it seems clear that the appraiser would have had no difficulty in determining the price which the American producers not shown to have sold their product "would have received" or were "willing to receive." As a basis he had the price that was being received upon valid contracts by the "major" producers, the price that was being quoted for future delivery by one of the major producers, and the price at which the foreign product was being sold. The appraiser would have been justified in using any of this data in finding the price the American producer or owner would have received had he placed his product for sale. Since appellant has offered no evidence tending to negative the possibility of a correct American selling price appraisal under the second part of section 402(g), it follows that he has not overcome the presumption of correctness attaching to the appraiser's valuation, and has not made out a *prima facie* case.

The alternate parts of the American selling price formula do not require that the domestic merchandise be freely offered to all pur-

chasers, but only that there be a price which a manufacturer, producer, or owner would have received or been willing to receive in the ordinary course of trade for the usual wholesale quantities. In the instant case, the record establishes that the Rover was offered and sold to retail stores and to two wholesalers, but not to other wholesalers or jobbers. In the ordinary course of trade, the manufacturer sold to retailers at list prices, less 2 per centum. The usual wholesale quantity appears to be 1 pair or 12 pairs. The company will sell 1 pair, but a 50-cent service charge is made for orders of less than 12 pairs. There were quantity and seasonal discounts and a special discount for the two wholesalers. It is clear that the manufacturer was willing to receive the list prices, less 2 per centum, for the Rover shoe.

In the *MacDonaugh* case, *supra*, which also involved a shoe made by the United States Rubber Co., the court said (p. 43) :

From Pennington's testimony, it is apparent, we think, that the company which he represented was not actually *trying to sell*, in the region of which San Francisco was the principal market, shoes of the type here involved to any concerns other than retailers. In all the Pacific Coast region the company had just one jobber customer. It was located at Sacramento, California. There were other jobbers in the region. There is no evidence showing that salesmen called upon such jobbers, or that their patronage was sought by mail, or in any other manner, but, on the other hand, there is no evidence that any jobbers ever sought to become customers, or that the United States Rubber Company ever received an offer from any concern to purchase which it refused.

Certainly all the pertinent testimony of Pennington and other witnesses is to the effect that the United States Rubber Company would have been "willing to receive" the list prices of the shoes (allowing discounts as is customary in business transactions) "sold in the ordinary course of trade and in the usual wholesale quantities, at the time of exportation of the imported article." [Emphasis quoted.]

The facts in this case are not sufficiently different to distinguish the *MacDonaugh* case, which is controlling on this point. Apparently, the situation has not changed.

The statement that United States Rubber Co. does not sell to wholesalers, distributors (except two), or discount houses is that of its own officers, yet they deny they would refuse to sell to anyone who offered to pay the established price. What is meant, I believe, is that they refuse to wholesalers, etc. (except two), the special discounts normally expected by them, and without which they could not normally operate at a profit. If, however, under some unusual circumstances, a wholesaler wanted to buy Rovers at the retailer's price, he would be accommodated. A buyer does not have to prove he is a retailer, to have his order filled. Businessmen have difficulty at times perceiving the legal existence of a free offer to persons it is known will not buy. A freely offered price exists if offers at that price are made to all who are in the class of those likely to pay it, and no one willing to pay it is

refused. *United States* v. *Glanson Co.*, 47 CCPA 110, C.A.D. 740; *Rico, Inc.* v. *United States*, 48 CCPA 110, C.A.D. 773; *Sani-Smoke, Inc.* v. *United States*, 50 CCPA 82, C.A.D. 825.

Even if it were found that the Rover shoe was not similar or that there was no American selling price for it, plaintiff's claim that the merchandise is dutiable on the basis of the entered value could not be sustained, unless I found that no other domestic article like or similar to the imported article existed or that if it did exist, that no American selling price could be found for it.

The proof here does not establish that no domestic shoe similar to the imported article existed, but indicates the contrary. For instance, Jacob Werbin, national sales manager of The Rubber Corp. of California, testified that his firm produced and sold rubber-soled canvas-top tennis oxfords similar to plaintiff's exhibits 6 and 9 during 1958, 1959, and 1960; that such shoes were very close to exhibit 9 (the imported article) because the purpose was the same, although the outsole and the foxing were different. Joseph Svoboda, vice president and treasurer of the Bata Shoe Co., Inc., said that exhibit 9 is similar to shoes produced by his firm. He stated that the material was about the same; the design on the sole was similar; the construction was similar; and the shoes could be used for the same purposes. John C. MacKinnon, general manager of B. F. Goodrich Co., testified that his firm produced and sold footwear similar to exhibit 9, with the same general type of sole and heel design, made of similar materials, and serving the same purpose. William H. Smith, president of Bristol Manufacturing Corp., testified that his company produced and sold rubber-soled canvas-top tennis oxfords like or similar to plaintiff's exhibit 9. Wallace E. Brimer, president of Tyer Rubber Co., said that his firm produced and sold an article like or similar to exhibit 9, having similar material, construction, design of sole and heel, and having the same uses. There are about 20 major producers, of whom the majority were not covered by this kind of testimony.

Plaintiff claims, however, that none of these shoes could be used for the purpose of determining American selling price on the ground that they were not sold in accordance with the terms and conditions in section 402a(g), *supra*. Here, again, while it may be that not all of the products were freely offered and sold to all purchasers, there were prices which the evidence indicated the manufacturers were willing to receive for them, or for shoes counterparts of the imports.

It is not necessary to make findings respecting shoes of other manufacturers, in view of my findings respecting the Rover, but the record is in existence and could be important if a reviewing tribunal took a different view than I do as to the validity of the appraisement based on the Rover. It was not contended that any of these other domestic shoes

were identical to the import, as against being merely similar, as the Rover is, nor was any attempt made to show any of them were more similar than the Rover. Some of them may possibly have been "freely offered" at lower prices than the Rover, but no argument was made that among counterparts of equal similarity, the appraiser was required to select the one selling at the lowest price.

After the parties had rested and submitted, the late Judge Mollison, in a decision reported in 48 Cust. Ct. 559, Reap. Dec. 10175, *supra*, set aside the submissions and restored the case to the calendar. His statement of his reasons is quoted above. Thereafter, hearings were held at a number of ports and consideration was given to testimony offered by plaintiff which related to the products and selling practices of some manufacturers other than United States Rubber Co. Plaintiff, however, still insisted at the opening of the final hearing before me that by proving the appraisement based on the Ked Rover was invalid, it had shifted to the Government the burden of establishing that any other basis for American selling price appraisement existed.

There might possibly be some easier way of meeting plaintiff's burden as Judge Mollison stated it. The way plaintiff went about it makes the task appear impossible and Judge Mollison's view tantamount to an expression that it is futile to challenge in court an American selling price appraisement of rubber-soled canvas upper footwear. Plaintiff, to prove its case, was required or supposed it was required to obtain the cooperation—voluntary or forced—of numerous parties having or supposing they had a large pecuniary interest in plaintiff's losing its case. This, of course, does not prove that Judge Mollison was in error; however, I believe that courts ordinarily frame rules as to burden of proof and burden of going forward on the basis of what will most readily get justice done. If it had been true that no American manufacturer sold or would have sold a shoe legally acceptable as a counterpart, the procedure employed was not well adapted to place the facts before the court in the form of competent evidence. The result I reach renders moot any question whether I would reaffirm or disavow Judge Mollison's rule, a question I would have had to decide had my analysis of the evidence respecting the Rover been different. American selling price appraisement and reappraisement I believe to be arts peculiar to themselves, and rules of substantive law, evidence, and procedure developed in other contexts all are to be applied with caution, if at all. The record herein ought not to be overlooked by anyone seeking to frame rules of procedure and burden of proof for American selling price cases.

For the reasons stated, the appraised values should be sustained.

I find as facts:

1. That the merchandise involved herein consists of so-called tennis oxfords, having uppers wholly or in chief value of cotton and soles

wholly or in chief value of rubber, exported from Japan during 1958, 1959, and 1960.

2. That the imported merchandise was of the class or kind described in Presidential Proclamation No. 2027, dated February 1, 1933, 63 Treas. Dec. 232, T.D. 46158.

3. That the imported merchandise was of the kind described in paragraph 1530(e), Tariff Act of 1930, as modified by the Protocol of Terms of Accession by Japan to the General Agreement on Tariffs and Trade, T.D. 53865.

4. That the imported merchandise was appraised on the basis of the American selling prices of a circular vamp oxford produced by the United States Rubber Co., called the "Rover," a style in the line sold under the registered brand name "U.S. Keds."

5. That the Rover and the imported merchandise had a similar appearance, were made of similar material, were of similar construction, had substantially the same uses and purposes, and would compete for purchase by many of the same persons. That the Rover was heavily advertised and the imported article was not; that the Rover was somewhat superior in durability and sold at a higher price; that the channels of distribution were substantially but not completely different.

6. That, in the ordinary course of trade, the Rover was freely offered and sold only at list prices, less 2 per centum, the price not varying according to the quantity purchased, except for a surcharge of 50 cents for a purchase under 12 in quantity. That most sales were to retailers. That no additional discount was offered to wholesalers or jobbers, except for two in a restricted category. That factory makeup discounts were allowed for orders accepted from August 1 through December 31, for shipment December 1 through April 25, and quantity discounts for at-once orders of 480 pairs or more in case lots of 1 item.

7. That the manufacturer received or was willing to receive for the Rover, when sold in the ordinary course of trade and in the usual wholesale quantities at the time of exportation of the imported article, the list prices, less 2 per centum, which prices were equal to the appraised values.

I conclude as matters of law:

1. That Presidential Proclamation No. 2027 has not been abrogated or suspended by the modification of paragraph 1530(e), Tariff Act of 1930, by the Protocol of Terms of Accession by Japan to the General Agreement on Tariffs and Trade, T.D. 53865.

2. That the proper basis for determining the values of the imported merchandise is the American selling price, as defined in section 402a(g), Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, 70 Stat. 948.

3. That the U.S. Keds "Rover" is similar to the imported merchandise.

4. That the American selling prices of the U.S. Keds "Rover" were those found by the appraiser.

5. That the dutiable values of the imported merchandise are the appraised values.

Judgment will be rendered accordingly.