(R.D. 11674)

ALDRICH CHEMICAL COMPANY, INC. *v.* UNITED STATES

Entry No. 2652, etc.

(Decided July 17, 1969)

*Marvin E. Klitsner* for the plaintiff.

*William D. Ruckelshaus,* Assistant Attorney General (*Bernard J. Babb* and *Andrew P. Vance,* trial attorneys), for the defendant.

MALETZ, Judge: These eight consolidated appeals for reappraisement involve a chemical known as 3-hydroxypyridine which was exported from Denmark via Milwaukee, Wisconsin, during the period from March 1966 to July 1967. It was appraised by the government on the basis of American selling price, as defined in section 402(e) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956 (19 U.S.C. (1964 ed.) § 1401a(e)), and the appraised values were determined to be in the amounts listed below.[1]

In cases R67/5482, R67/5483, R67/5484 and R67/7988—covering the exports from March 11, 1966 to June 21, 1966—plaintiff, the importer of the merchandise, claims the proper basis of valuation is not American selling price but export value, as defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956 (19 U.S.C. (1964 ed.) § 1401a(b))—which export value is alleged to be $4.55 per pound. Alternatively, it is claimed that in the event the proper basis of valuation in these cases is American selling price, such price should be $13.50 per pound rather than $15.00 per pound as determined by the government appraiser.

In cases R67/7987, R67/13310, R67/15505 and R67/17753—covering the exports from October 6, 1966 to July 15, 1967—plaintiff does not dispute that American selling price is the proper basis of valuation but claims that such selling price should be $13.50 per pound instead of the amounts found by the government appraiser (as set out in note 1).

It is important to note at the outset that the imported chemical was advisorily classified under item 403.60 of part 1, schedule 4 of the Tariff Schedules of the United States (19 U.S.C. (1964 ed.) § 1202). In that circumstance, its appraisement is governed by headnote 4 of part 1, schedule 4 of the tariff schedules which provides:

> 4. The ad valorem rates provided in this part shall be based upon the American selling price, as defined in section 402 or 402a

| [1] Case No. | Export Date | Appraised Valuation |
|---|---|---|
| R67/5482 | Mar. 11, 1966 | $15.00 per pound less 1% net packed |
| R67/5483 | Apr. 2, 1966 | " " |
| R67/5484 | Apr. 24, 1966 | " " |
| R67/7988 | Jun. 21, 1966 | " " |
| R67/7987 | Oct. 6, 1966 | " " |
| R67/13310 | Mar. 16, 1967 | " " |
| R67/15505 | Apr. 19, 1967 | $13.00 per pound |
| R67/17753 | Jul. 15, 1967 | " " " |

of this Act, of any similar competitive article manufactured or produced in the United States. If there is no similar competitive article manufactured or produced in the United States then the ad valorem rate shall be based upon the United States value, as defined in the said section 402 or 402a.

Also relevant are the following provisions of section 402 of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956:

(b) Export Value.—For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the mechandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

(c) United States Value.—For the purposes of this section, the United States value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal market of the United States for domestic consumption, packed ready for delivery, in the usual wholesale quantities and in the ordinary course of trade, with allowances made for—

(1) any commission usually paid or agreed to be paid, or the addition for profit and general expenses usually made, in connection with sales in such market of imported merchandise of the same class or kind as the merchandise undergoing appraisement;

(2) the usual costs of transportation and insurance and other usual expenses incurred with respect to such or similar merchandise from the place of shipment to the place of delivery, not including any expense provided for in subdivision (1); and

(3) the ordinary customs duties and other Federal taxes currently payable on such or similar merchandise by reason of its importation, and any Federal excise taxes on, or measured by the value of, such or similar merchandise, for which vendors at wholesale in the United States are ordinarily liable.

If such or similar merchandise was not so sold or offered at the time of exportation of the merchandise undergoing appraisement, the United States value shall be determined, subject to the foregoing specifications of this subsection, from the price at which

such or similar merchandise is so sold or offered at the earliest date after such time of exportation but before the expiration of ninety days after the importation of the merchandise undergoing appraisement.

\*        \*        \*        \*        \*        \*        \*

(e) American Selling Price.—For the purposes of this section, the American selling price of any article produced in the United States shall be the price, including the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the article in condition packed ready for delivery, at which such article is freely sold or, in the absence of sales, offered for sale for domestic consumption in the principal market of the United States, in the ordinary course of trade and in the usual wholesale quantities, or the price that the manufacturer, producer, or owner would have received or was willing to receive for such article when sold for domestic consumption in the ordinary course of trade and in the usual wholesale quantities at the time of exportation of the imported article.

In light of these statutory requirements, plaintiff, in order to prevail on its claim that the first group of exports from March 1966 to June 1966 should be appraised on the basis of export value—at $4.55 per pound—rather than on the basis of American selling price, had the following burden: First, it had to establish that an American selling price basis of appraisement was inapplicable—which required plaintiff to prove by a preponderance of the evidence that at the time of the exportations (i) no similar competitive article produced in the United States was freely sold or offered for sale in the United States; and (ii) that there was no price that a producer or owner of such an article would have received or was willing to receive for such article when sold for domestic consumption. Second, in the event plaintiff established the non-existence of an American selling price, it had to show that a United States value basis of appraisement was likewise inapplicable—which necessitated its proving that at the time of the present exportations there was no price at which such or similar merchandise was freely sold or offered for sale in the principal market of the United States. Third, plaintiff had to prove that its claimed export value of $4.55 per pound is correct.

Plaintiff's alternative burden in this group of cases, as well as its burden in the second group of cases—covering the exportations from October 1966 to July 1967—was to prove the correctness of its claimed American selling price of $13.50 per pound.

It is in this context that the facts shown by the record are now considered. Plaintiff, a Milwaukee, Wisconsin concern, is in the business of importing, manufacturing and distributing organic chemicals. One of the products it imports and sells (in as little as quarter-pound quantities) is the chemical here involved—3-hydroxypyridine (some-

times referred to hereafter as "3-HP") which is mainly used by pharmaceutical companies as a starting material to make pharmaceutical-finished products. In the period from March 1966 to July 1967, when the exportations in issue took place, there was only one domestic manufacturer of 3-HP—the Nepera Chemical Co. of Harriman, New York. During part of that period, i.e., from March 1966 to June 1966, Nepera's equipment—while ample for the production of 3-HP—was taken up by orders for other chemicals. As a result, 3-HP was not available from Nepera between March and June 1966. The situation was such that companies, which were not previously plaintiff's customers, purchased imported 3-HP from plaintiff during this period and reported to its president that they were unable to secure delivery from Nepera. Withal, Nepera accepted orders in the March–June 1966 period for delivery in the winter of 1966–67 when it planned to produce—as it did—a large batch of 3-HP.

Illustrative is the experience of Lakeside Laboratories of Milwaukee, a division of the Colgate-Palmolive Company. In March 1966, Lakeside placed an order with Nepera for 500 pounds of 3-HP and requested delivery by July 1, 1966. Though Lakeside's buyer made repeated telephone calls in an effort to obtain delivery of some or all of this order, the first delivery, consisting of only 150 pounds of 3-HP, was not received until November 1966. In April 1966, Lakeside placed another order with Nepera for 2,000 pounds of 3-HP. This time it was estimated that delivery in installments of 500 pounds each would take place in January, February, April and May of 1967. Actually in filling this second order, Nepera delivered 500 pounds of 3-HP to Lakeside in December 1966, and the same amounts in February, April and June of 1967. Nepera's price, it may be added, for the 2,500 pounds of 3-HP it thus sold to Lakeside was $13.50 per pound. The record affords no indication, however, as to how this price was arrived at.

Also illustrative is the experience plaintiff itself had with Nepera. In March 1966, plaintiff placed an order with Nepera for a product, 2-hydroxymethyl pyridine hydrochloride, which requires the use of 3-HP as a starting material. Delivery of this product was requested in 30 days—i.e., in April. Not having received delivery by July, a representative of plaintiff communicated with Nepera's sales manager who advised that the 3-HP needed as a starting material was unavailable. Plaintiff's representative then indicated that plaintiff could fill Nepera's needs for the necessary 3-HP. On being thus advised, Nepera placed an order with plaintiff for 30 pounds of 3-HP—which was approximately the amount of 3-HP required to manufacture the 2-hydroxymethyl pyridine hydrochloride that plaintiff had ordered in March 1966. Plaintiff shipped the 3-HP immediately—at a price of

$10.00 per pound—and in the latter part of that year obtained delivery of the 2-hydroxymethyl pyridine hydrochloride.

We proceed now to determine whether the record thus made negates the existence of an American selling price for the exportations that were made between March and June 1966—as contended by plaintiff. As we have seen, this required plaintiff to prove that during that period no similar competitive article produced in the United States was freely sold or offered for sale in the United States. The record establishes in this connection that during the March–June 1966 period, Nepera, the only domestic producer of an article similar to the one here involved, made no sales thereof in the United States. Moreover, it appears that Nepera was unable, within a reasonable period of time, to satisfy whatever offers of sale it made. In that circumstance, the article was not freely offered for sale within the statutory meaning. For "[t]o freely offer an article for sale within the contemplation of subdivision * * * [e] it should, at least, appear that some reasonable quantity of the offered article was ready or could be produced for reasonably prompt delivery." *Kuttroff, Pickhardt & Co. v. United States*, 14 Ct. Cust. Appls. 176, 184, T.D. 41698 (1926). See also e.g., *Kuttroff-Pickhardt & Co. v. United States*, 14 Ct. Cust. Appls. 381, 390, T.D. 42032 (1927); *White Lamb Finlay, Inc. v. United States*, 29 CCPA 199, 208, C.A.D. 192 (1942). The situation in short is that between March and June 1966 no similar competitive article produced in the United States was freely sold or offered for sale in the United States within the meaning of section 402(e).

But this does not end the matter. In order to prove that an American selling price was inapplicable, it was incumbent upon plaintiff not only to show the absence of a freely offered price, it had to show also that in the relevant time period—March–June 1966—there was no price that Nepera "would have received or was willing to receive for such [competitive] article." See e.g., *Hudson Shipping Co., Inc. v. United States*, 43 CCPA 19, 28, C.A.D. 604 (1955); *Kuttroff, Pickhardt & Co. v. United States*, 13 Ct. Cust. Appls. 17, 21, T.D. 40861 (1925). These quoted statutory terms were construed as follows in *Hudson Shipping* (43 CCPA at 29–30):

> * * * We do not construe the words "would have received" so that they mean the same as "was willing to receive" for that would make the statute unnecessarily redundant. We feel that the price that the producer would have received means the price that would *have been* received had the item been placed on the market. In this meaning, the wording is the equivalent substantially of "reasonable value," and there are no serious difficulties in finding such a value. * * * [Emphasis in original.]
>
> In this case, from the evidence introduced, it seems clear that the appraiser would have had no difficulty in determining the

price which the American producers not shown to have sold their production "would have received" or were "willing to receive." As a basis he had the price that was being received upon valid contracts by the "major" producers, *the price that was being quoted for future delivery by one of the major producers*, and the price at which the foreign product was being sold. *The appraiser would have been justified in using any of this data in finding the price the American producer or owner would have received had he placed his product for sale.* * * * [Emphasis added.] [2]

As in *Hudson Shipping*, it seems clear that in the present case the appraiser would likewise have had no difficulty in determining the price which Nepera "would have received" or was "willing to receive" for 3-HP in the applicable time period. Indeed, if nothing else, the appraiser would have been justified in using the price or prices Nepera quoted to its customers between March and June 1966 for delivery that winter. Plaintiff, however, has presented no evidence whatever tending to negate the possibility of an American selling-price appraisal thus determined under the second part of section 402(e). On this ground it follows that it has not overcome the presumption of correctness attaching to the appraiser's valuation. Further, "[s]ince it is not disputed that a similar competitive product is produced in the United States, the language of paragraph 27(c) [which was essentially similar to headnote 4, part 1 of schedule 4 of the tariff schedules] would seem automatically to require that value be determined by the 'American selling price' formula. *The wording of that paragraph does not seem to contemplate any circumstances under which there would not be an American selling price where there was an identical domestic product.*" *Hudson Shipping Co., Inc.* v. *United States, supra,* 43 CCPA at 22. [Emphasis added.]

But even it it were to be assumed—contrary to the actual situation—that the plaintiff had proven that an American selling price did not exist, this would not mean *ipso facto* that export value was the proper basis of appraisement. Rather, in such a circumstance, headnote 4, part 1 of schedule 4 of the tariff schedules would make it necessary for plaintiff to prove that at the time of exportation (March–June 1966) no United States value, as defined by section 402(c), existed.[3] However, not only has plaintiff failed to present any evidence tending to

---

[2] See also *Kuttroff, Pickhardt & Co.* v. *United States, supra,* 14 Ct. Cust. Appls. at 185; *Trans World International Service Co.* v. *United States,* 44 Cust. Ct. 643, 646–47, Reap. Dec. 9657 (1960); *A. Zerkowitz & Co., Inc.* v. *United States,* 55 Cust. Ct. 643, 658, Reap. Dec. 11095 (1965), *aff'd* 62 Cust. Ct. 986, A.R.D. 250, 297 F. Supp. 350 (1969).

[3] As previously set out, section 402(c) provides in part that "the United States value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which *such* or similar merchandise is freely sold or * * * offered for sale in the principal market of the United States for domestic consumption * * *." [Emphasis added.]

negate the existence of a United States value for the merchandise in issue, the evidence it did present showed that there was, in fact, a United States value for such merchandise at the time of exportation. This was established by the testimony of plaintiff's president that during the period between March and June 1966, plaintiff was selling imported 3-HP to persons who had not previously been plaintiff's customers. See *United States* v. *Gane & Ingram, Inc.*, 24 CCPA 1, 4–6, T.D. 48264 (1936).

And assuming further—again contrary to the actual situation—that plaintiff has shown that American selling price and United States value were both inapplicable, plaintiff still could not prevail inasmuch as it has offered no evidence whatsoever to support the correctness of its claimed export value of $4.55 per pound. This was the burden of plaintiff—not of the government. Failing to sustain that burden, the value determined by the government appraiser must remain in full force and effect. *Kenneth Kittleson* v. *United States*, 40 CCPA 85, 89, C.A.D. 502 (1952); *Kobe Import Co.* v. *United States*, 42 CCPA 194, 198, C.A.D. 593 (1955).

We come now to plaintiff's alternative claim in the first group of cases covering the exports from March to June 1966 and its claim in the second group of cases covering the exports from October 1966 to July 1967 that the correct American selling price should be $13.50 per pound rather than the amounts determined by the government appraiser. On this issue, plaintiff's sole proof consisted of the two sales made by Nepera to Lakeside of 2,500 pounds of 3–HP for a price of $13.50 per pound. To this must be added the fact that plaintiff's own witness conceded that Nepera was taking orders from customers other than Lakeside. Yet plaintiff offered no evidence whatever as to what Nepera's price was to these other customers. Hence plaintiff, in essence, would have an American selling price—i.e., the price at which Nepera freely sold 3-HP—determined on the basis of what appears to be two isolated sales to Lakeside in the amount of $13.50. This is manifestly insufficient. And when it is considered, in addition, that the record affords no indication as to how this price of $13.50 was arrived at, the conclusion is inescapable that plaintiff has simply not proven the correctness of its claimed American selling price.

For the reasons stated, the appraised values are sustained.

I find as facts:

1. That the merchandise herein consists of 3-hydroxypyridine exported from Denmark during the period commencing in March 1966 and culminating in July 1967;

2. That the merchandise does not appear on the Final List promulgated by the Secretary of the Treasury as T.D. 54521;

3. That the merchandise was appraised on the basis of American selling price as that value is defined in section 402(e) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956;

4. That the plaintiff has failed to prove that there was no price that a manufacturer, producer or owner would have received or was willing to receive during the period in question for 3-hydroxypyridine produced in the United States;

5. That the plaintiff has failed to prove the claimed lower values as the proper dutiable values herein.

As conclusions of law, I hold that:

1. Plaintiff has failed to overcome the presumption of correctness attaching to the appraised values herein, and has failed to prove another correct dutiable value for the merchandise.

2. American selling price, as defined in section 402(e) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, is the proper basis for the appraisement of the merchandise in question.

3. The American selling price is represented by the appraised values in each case.

Judgment will be entered accordingly.