| Reappraisement No. | Collector's No. | Entry No. | Type |
|---|---|---|---|
| 108245–A | 2492 | 1757 | C–6 15 v. Xmas Tree Lamps.<br>15 v. Bell shaped Xmas Tree Lamps. |

JAPAN IMPORT CO. *v.* UNITED STATES

**No. 4389.**—Invoices dated Kobe, Japan, April 17, June 11, May 16, 1934. Certified April 19, June 12, May 18, 1934.

Entered at New York May 19, July 16, June 19, 1934. Entry Nos. 826361, 704079, 836414.

(Decided September 19, 1938)

*Barnes, Richardson & Colburn* (*Joseph Schwartz* of counsel) for the plaintiff.
*Charles D. Lawrence,* Acting Assistant Attorney General (*Daniel I. Auster* and *Richard F. Weeks,* special attorneys), for the defendant.
*Lamb & Lerch* (*Kenneth G. Osborn* of counsel), amicus curiae.

SULLIVAN, Judge: These reappraisements relate to certain shoes having *paper* and cotton uppers and rubber soles, imported by the plaintiff from Japan. The invoices are dated Kobe, Japan, April 17, May 16, and June 11, 1934, respectively. According to the memoranda of "Appraiser's Advance to Invoice Value" attached to the invoices in each reappraisement, these shoes were advanced in value by the appraiser "over 100 per centum."

Appraisement was made on the basis of the American selling price as provided in section 402 (g) of the Tariff Act of 1930, by virtue of the President's proclamation under section 336 of said act, issued February 1, 1933, and set forth in T. D. 46158, 63 Treas. Dec. 232, "changing the basis for the assessment of duty on certain rubber-soled footwear and rubber footwear from the foreign-market value to the American selling price."

It will be observed that the President's proclamation does not refer specifically to rubber-soled footwear having uppers of cotton and *paper*, but to such footwear "the uppers of which are composed wholly or in chief value of wool, cotton, ramie, animal hair, fiber, rayon, or other synthetic textile, silk, or *substitutes for any of the foregoing*," and for this reason plaintiff contends that these shoes are not covered by the proclamation, and accordingly should not have been appraised on the American selling price, but that the correct dutiable value of the imported shoes is their export or entered value.

It will be observed that said section 336 of the tariff act provides, among other things, for an investigation by the Tariff Commission of "the differences in the costs of production of any domestic article and of any like *or similar* foreign article" and for a report to the President of "the results of the investigation and its findings with respect to such differences in costs of production." As a result of such investigation as to certain rubber-soled footwear, the President issued his proclamation heretofore referred to providing that the duty on such footwear with the uppers of the material specified in the proclamation "is 35 per centum ad valorem based upon the American selling price as defined in section 402 (g) of said act."

The sole question for determination is: Should these shoes have been appraised upon the American selling price or upon their export value?

As further reasons for its contention that this merchandise should have been appraised upon its export value, the plaintiff calls attention to the wording of section 402 (g) that "The American selling price * * * shall be the price * * * at which *such* article is freely offered for sale to all purchasers in the principal market of the United States" and that inasmuch as the shoes at bar are not *such* articles as are provided for in the Presidential proclamation, but

only *similar* articles, "it was illegal for the appraiser to appraise the imported shoes in the case at bar, which have uppers composed of *substitutes*, on the American selling price of domestic shoes having uppers composed of *cotton*"; that "the imported shoes are not like or similar to the domestic shoes upon the basis of which they were appraised"; that "Inasmuch as shoes 'such as' or even 'like or similar to' the imported shoes, were not manufactured in the United States, the entered value, * * * constitutes the dutiable value."

As a further argument for its contention that section 402 (g) does not cover this merchandise, plaintiff calls attention to the fact that section 402 (g) differs from the other provisions of section 402, providing for foreign, export, United States value, and cost of production. Section 402 (g) provides that the American selling price shall be the price at "which such article" is freely offered for sale, etc., while the provisions as to foreign, export, United States value, and cost of production, provide that such values and cost shall be those "at which such *or similar* merchandise is freely offered" etc., or the cost, etc., of producing "such or *similar* merchandise"; and that this indicates the intent of Congress that section 402 (g), by reason of the difference of wording we have indicated, was intended to relate to the *exact* merchandise, or the *same* merchandise as imported, and not *similar* merchandise; that this exact merchandise is not "manufactured or produced in the United States" and is not "freely offered for sale to all purchasers in the principal market of the United States," and therefore should not have been appraised under section 402 (g) as the proclamation does not affect the exact merchandise at bar.

I gather from the record (pp. 10, 14 to 16) that both sides have conceded orally in open court that if the American selling price is not the proper dutiable value, the proper dutiable value is the export value, and that there is no higher foreign value; also that, if there is an American selling price for this merchandise, the appraised value is correct. These so-called concessions, however, are not entirely clear from the record. The Government admits (p. 14):

* * * that if this Court should find as a fact that the imported shoe is not like or similar to the domestic shoe, under all sections 336 and 402 (g) of the Tariff Act of 1930, that then the entered value represents the correct dutiable value, as the export value of the imported shoe.

Plaintiff's witness Gold testified he is an examiner in the office of the appraiser of merchandise at the port of New York, and has been such for twenty-six years, passing upon, among other things, "footwear of all descriptions"; that he passed upon the merchandise at bar, and saw it when it was imported. He described this merchandise as follows:

It covers rubber-soled oxfords, with uppers, two piece uppers, consisting of a veneer of paper, and a lining of cotton.

He testified he made an advisory classification of this merchandise under paragraph 1530 (e), and that his classification "was motivated on the basis of the decision of the United States Customs Court in T. D. 44004," or *Tai Lung Co.* v. *United States*, 18 C. C. P. A. 35.

The witness then testified he sought to find whether there was a like or similar domestic article to that at bar, and stated the investigation he made.

The witness then produced four samples of the shoes at bar. They were received in evidence as Collective Exhibits 1, 2, 3, and 4. He testified he found a shoe like the imported article "with the exception of the upper part," or "the outer part of the imported shoes," *and that he would not consider it identical;* that prior to his appraisement it was his opinion there were not any domestic articles like or similar to the shoes at bar.

The witness then produced certain domestic shoes on the basis of which he appraised the imported shoes in this case. They were received in evidence as Exhibits 1–A, 2–A, 3–A, and 4–A. He testified he appraised the shoes at bar on the American selling price of the shoes represented by Exhibits 1–A, 2–A, 3–A, and 4–A; that he changed his mind from his opinion prior to appraisement, and found that the domestic article was like and similar to the imported article "under the broad meaning of 336," as a matter of fact. The witness in response to questions by the court then stated the similarity between the shoes at bar and the domestic articles as follows:

Both articles are known as rubber soled oxfords, both the imported and domestic articles. The imported article consists of a two-piece upper of "Toyo" paper cloth. * * * "Toyo" paper cloth is the trade name. * * * It has paper * * * part of the veneer has the paper. * * * That is the outside. That part weighs approximately six ounces to the square yard * * * and the drill lining weighing approximately three ounces to the square yard. * * *

Judge Sullivan. What material is that?

The Witness. Heavy coarse cotton with a full yarn width. * * * It has a rubber calendared sole. It has a fancy foxing attaching by that the rubber sole to the upper.

Judge Sullivan. Now you are talking about Exhibit 1, the imported article.

The Witness. I am speaking of Exhibit 1. The purpose of the foxing is to attach the sole or reinforcement sole to the upper for ornamental purposes. It has five eyelets, and has an eyelet stay to reinforce the eyelets. * * * Inside the shoe. It has a cotton tongue; it has a cotton counter and it has a cotton binding; it has an inside rubber tip, inside the upper of the shoe. * * * Now we have the domestic article. * * * Exhibit 1–A, also known as a rubber soled oxford, comprised of a two-piece upper quarter and vamp. * * * It has a two-piece upper quarter and vamp, weighing approximately six to six and one-half ounces to the square yard.

Judge Sullivan. It is a little heavier than Exhibit 1.

The Witness. Slightly heavier. It has a drill lining of this heavy coarse cotton, with a full yarn weighing approximately three ounces to the square yard. It is single and double stitched throughout, identical with the imported shoe.

It has a single foxing, attaching the upper to the sole, used for reinforcement, and ornamental purpose. It has a cotton binding; it has a composition inner sole, and it has a cotton counter stitched to the shoe, and it has a rubber tip on the outside of the shoe.

Judge SULLIVAN. Does it have any paper in it?

The WITNESS. No paper in this particular shoe. Checking other parts they are equal as far as gauge is concerned, as far as characteristics are concerned, as far as adaptability are concerned. They are sold in the same shops; made by the same process of manufacture. * * * The only difference in the two shoes is in that slight difference in structure of the upper material of Toyo——

MR. AUSTER. Outer upper.

The WITNESS. Outer upper. * * * That is the only difference, taking the other parts, part for part, the two shoes are equal.

Q. Is there any difference in the inner tip?—A. Only slight * * * There is a rubber tip on the front part of the vamp on the domestic shoe. There is a rubber tip on the inside of the imported shoe of the vamp.

Referring to the other exhibits the witness testified, "They are all alike."

I have Exhibits 1 and 1-A before me. The points of similarity are that they are both white rubber-soled shoes. The domestic article appears to be better than the imported. The former has a rubber tip over the toe; the latter has not. The white upper of Exhibit 1-A, the domestic article, is clearly white canvas on the outside lined with an unbleached cotton material. The outside of the white upper of the imported article, Exhibit 1, is widely different in appearance. It has the color of unbleached cotton cloth, or an ecru color. It resembles cotton cloth in appearance, but the testimony is it is "Toyo" *paper* cloth. The lining or the inside of the upper of the imported shoe is cotton cloth similar to that in Exhibit 1-A the domestic article.

To the eye the two shoes are very far from being identical in appearance, manufacture, and the material of the uppers. There is a similarity between the two shoes. However, you would not mistake one shoe for the other.

The testimony indicates that Examiner Gold first came to the conclusion that the domestic shoe, represented by Exhibit 1-A, was not like or similar to the imported merchandise, Exhibit 1, and that he subsequently changed his mind, and concluded that the domestic shoe was like or similar to the imported shoe.

Plaintiff's witness Heymann testified he was buyer and salesman for the plaintiff herein; that he "bought footwear and Japanese merchandise suitable to our trade"; that Exhibits 1 to 4 are "Toyo *canvas* shoes, and Toyo oxfords"; that he had not seen any domestic oxfords similar thereto; that "there were no domestic shoes like them." The witness then specified the differences between the domestic and imported shoes. The main difference is that the domestic shoe has an entirely canvas top, whereas the imported shoe

has "a Toyo paper top and a drill lining"; in addition, the domestic shoe is reinforced on the toe; the imported shoe is not.

The witness further testified that the domestic shoe can be cleaned by washing, and the imported shoe cannot, for the witness made the washing test with the imported shoe and "it simply fell apart. The upper would tear apart from the sole, in any water test at all"; that he sold the imported shoe with the following result:

After they were delivered, it was a sad experience, 90 per cent were returned to us. * * * They came apart the minute you wear them, the upper would tear away from the base of the shoe, due to the fact they could not vulcanize as well as the canvas top. The paper would not take the heat.

The witness testified he wore some of these "Toyo oxfords" once or twice, and "they came apart, the paper tore on top, or tore away from this rubber binding which held them together with the sole"; that after the importation of these shoes, and his experience in selling them, he dropped this item immediately.

Defendant's witness Rice testified he is connected with the Hood Rubber Co. of Watertown, Mass., who manufacture "Rubber and canvas footwear." The witness was shown Exhibits 1 and 1–A, and was asked whether the two exhibits were like or similar. He answered:

In comparing the two shoes, I would say they are very much alike in the eye appeal that you get from them. The upper or the outside upper seems to be the only difference there is. There is a slight difference in the last, but that becomes true of anybody's last. * * *. The difference in the last is immaterial to the consumer. * * * You have similarity in your tie. The sole difference is in design, * * * The rubber foxings, as they have them on here, are very similar. They both have inside bound juniors, and what you call counters are substantially the same. There is a lining in both shoes, which are a cotton drill, and are very similar. We use an outside, what we call a "toe-tip." They use an inside "toe-tip." That is put there to prevent the big toe digging through the upper. * * * The rubber tip is there, because the nail of your big toe sticks up higher than the others, and if you didn't put something in the toe, the big toe will eventually peck itself through. We put those toe tips on to prevent the breaking through, or strengthening. Another thing you would get, if you didn't do that, that makes the toe loft, whereas when you don't put that in, it makes the toe sink in. The practical part is to prevent the big toe from coming through. * * * It is the same in both cases, except No. 1 has it on the inside, and Exhibit 1–A has it on the outside.

On cross-examination the witness testified that he "would say" the domestic shoe was better than the imported; that "I would not think a paper is as good as a canvas upper."

Defendant's witness Bissell testified he is employed by the United States Rubber Products as assistant sales manager; that he first came in contact with the imported shoes in 1934 when Examiner Gold brought them to him, and he gave them a thorough examination and compared them with his shoe, called "Rover." He described the result of his comparison which in effect was that the two shoes were

similar, except in the outer fabric of the uppers, his shoe being of canvas "known in the trade as enameled duck" while the imported shoe, he was informed, had a paper upper, but "I would have to take somebody's word it is paper, a technical man, I cannot say whether it is paper or not." He then testified:

Q. Now, based upon your experience and knowledge and examination of these two shoes, would you say that they are like or similar?—A. Would I say they are like or similar?

Q. Yes.—A. I would say so.

Defendant's witness Little testified he is connected with the Hood Rubber Co. as sales manager; that he came in contact with Exhibit 1 "in the New York market, some time during the year 1934," but not since. Referring to Exhibit 4–A he testified he had seen it quite often; that there is a "difference in the appearance of the upper" between Exhibit 4, the imported shoe, and Exhibit 4–A, also in the fact that the imported shoe has an inside toecap, and the domestic shoe an outside toecap; that there was a falling off of his sales of Exhibit 4–A because of Exhibit 4.

On cross-examination he testified that the upper of the imported shoe was made of Toyo cloth composed of paper; that his company does not make any rubber-soled shoes with paper uppers, *and he does not know of any company making them in the United States.*

It was conceded that the outer upper in Collective Exhibit 4 was a substitute for the outer upper of Collective Exhibit 4–A.

Did Congress, in enacting section 402 (g) providing that the American selling price shall be the price at "which *such* article" is freely offered for sale, etc., while the other subsections of section 402 as to foreign, export, United States value, and cost of production, provide that such values or costs shall be those "at which such *or similar* merchandise is freely offered," etc., and in omitting from section 402 (g) the words "or similar," intend that section 402 (g) was enacted to provide that the American selling price shall be the price at which the *identical* article is freely offered for sale, etc.?

What does "such" mean?

In *United States* v. *Massin,* 16 Ct. Cust. Appls. 19, T. D. 42714, at page 23, the court said:

This court has heretofore held that the word "such", as used in Paragraph L, Section III, of the Tariff Act of October 3, 1913, in the language "such or similar imported merchandise," meant "identical," and no reason is perceived why the same meaning should not be attached to it here. *United States* v. *Johnson Co.,* 9 Ct. Cust. Appls. 258 (270), T. D. 38215.

* * * The law does not use the words "such" and "similar" synonymously, but with different meanings, and alternatively. In our opinion, foreign value was to be ascertained, first, by "the market value, or the price * * * at which such," or the *identical* merchandise is offered for sale * * * and, second, in the event that such merchandise is not so offered, then by "the market

value or the price," at which *similar* merchandise is offered. * * * "Similar" merchandise must be construed as different from "such" merchandise in order to give this statute full effect.

The foregoing authority is very specific and clear. The shoes at bar are not *identical* with rubber-soled canvas-topped shoes made in the United States, and not being sold in the United States it would seem that section 402 (g) cannot be applicable to the shoes at bar which are only *similar* to the domestic article, and not "*such* article as is freely offered for sale to all purchasers in the principal market of the United States."

Section 336 of the tariff act, however, provides for an investigation by the Tariff Commission of "the differences in the costs of production of any domestic article and of any like *or similar* foreign article" [italics ours] and to report to the President as to increases or decreases in duty rates thereon; also for approval by the President thereof.

It is contended the President's proclamation, T. D. 46158, is broad enough to cover such rubber-soled shoes as those at bar, for it is applicable to—

* * * shoes * * * the uppers of which are composed wholly or in chief value of * * * cotton, * * * rayon or other synthetic textile, * * * or *substitutes* for any of the foregoing, with soles composed wholly or in chief value of india rubber, * * * the growth or product of the United States, * * * and like or *similar* articles * * * the growth or product of the principal competing countries. [Italics ours.]

I am of opinion that this portion of the proclamation is not applicable for the President distinctly ordered that the rate of duty on the foregoing or "substitutes for any of the foregoing, with soles composed wholly or in chief value of india rubber or substitutes for rubber, is 35 per centum ad valorem based upon the American selling price *as defined* in section 402 (g) of said act." He did not attempt to amend section 402 (g). While there may be an inconsistency between the President's proclamation and section 402 (g) in that the proclamation covers "like or *similar* articles" while section 402 (g) relates to an American article such as or exactly like the imported article, such inconsistency does not amend section 402 (g). That section remains intact, not only in the President's proclamation but in section 336 of the tariff act under which the President acted; for that provides, referring to the report of the Commission after investigation—

* * * it shall so state in its report to the President and shall specify therein such ad valorem rates of duty based upon the American selling price (*as defined in section 402 (g)*) of the domestic article.

Thus the Commission's report is based on the valuation as provided by section 402 (g), being such articles, not like or similar articles. That statute has not been disturbed by either the President's proclamation or the report of the Commission.

In other words, section 402 (g) provides for appraisement of the imported article on the American selling price of "such" or identical articles to the imported as are sold in the United States. Now, a like or similar article may differ from the imported article in many respects, as the record indicates in the present case. Paper is not identical with canvas or cotton cloth of any kind. The facts not only show a dissimilarity between the articles, but in their use, for the imported article cannot safely be exposed to the action of water, and so would not be suitable for use in wet weather or damp places; the canvas, or domestic article, can, and is so substantial it can be cleaned by washing. But however that may be the evidence is satisfactory that the American article is not "such" article as the imported one, and therefore cannot fall within the provisions of section 402 (g).

From all the facts and the law in this case I am satisfied that the valuation found by the appraiser was erroneous, and that the shoes at bar should have been appraised on their export value.

I therefore hold that the proper dutiable value of the shoes at bar is the export value; and that the entered value of these shoes represents the export value thereof.

Judgment accordingly.