**A. ZERKOWITZ & CO., Inc.**

**v.**

**UNITED STATES.**

**A.R.D. 250; Reappraisement R60/20082.**

United States Customs Court
Second Division, Appellate Term.
March 5, 1969.

Sharretts, Paley, Carter & Blauvelt, New York City (Joseph F. Donohue, Howard Clare Carter, Eugene F. Blauvelt and Gail T. Cumins, New York City, of counsel), for appellant.

William D. Ruckelshaus, Asst. Atty. Gen. (Arthur E. Schwimmer, New York City, trial attorney), for appellee.

Lamb & Lerch, New York City (David A. Golden, New York City, of counsel), amici curiae.

Before FORD, RICHARDSON, and LANDIS, Judges.

FORD, Judge:

This is an application for review of a decision and judgment of the trial court holding certain imported canvas-topped, rubber-soled footwear to be subject to appraisement on the basis of American selling price as defined in section 402a (g), Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, 91 Treas.Dec. 295, T.D. 54165. A. Zerkowitz & Co., Inc. v. United States, 55 Cust. Ct. 643, Reap.Dec. 11095.

The footwear the subject of the reappraisement appeals at bar which were consolidated for trial is of Japanese manufacture and origin, is composed of a cotton canvas upper and a rubber or rubber substitute sole, and is generally described as a circular vamp tennis-type oxford shoe. Footwear of this kind appears on the Final List promulgated by the Secretary of the Treasury in T.D. 54521, by reason of which, valuation of same for customs purposes is governed by section 402a, Tariff Act of 1930, as amended by the Customs Simplification Act of 1956.

Appraisement of the involved footwear under section 402(g) was predicated upon Presidential Proclamation No. 2027, in T.D. 46158, 63 Treas.Dec. 232, and the so-called flexible tariff provisions of section 336, Tariff Act of 1930. The appraisers adopted as the domestic counterpart shoe the "Rover" tennis-type oxford shoe manufactured in the United States by the United States Rubber Company and marketed under its U. S. Keds label, returning the following prices, less 2 percent cash discount, packed, for the period of the involved exportations, as representing the selling prices for the domestic counterpart article:

| Price Year | Children's Sizes 5 – 12 | Juniors' sizes 12½ – 3 | Women's sizes 3½ – 10 |
|---|---|---|---|
| 1958–59 | $2.10 | $2.25 | $2.50 |
| 1959–60 | 2.20 | 2.35 | 2.65 |
| | | 2.40 | |

Appellant, the plaintiff-importer below, contended before the trial court and contends here that the imported footwear is not like or similar to the domestic counterpart footwear selected for appraisement purposes, nor like or similar to other domestically produced canvas-rubber tennis-type oxford shoes, and that the counterpart shoe and other domestically produced shoes as foresaid were not offered for sale or sold under conditions conforming to the statutory American selling price formula. In support of these contentions appellant adduced below the testimony of an officer and an employee of the importing firm here in-

volved, two shoe wholesalers, a shoe retailer, a shoe buyer, a textile engineer, a college professor of marketing, two customs examiners and two customs appraisers, an officer and an employee of a subsidiary company of the United States Rubber Company, and an officer and employees of other domestic manufacturers of canvas-rubber footwear. Appellant placed in evidence numerous documents, among which are price lists and sales policies of U. S. Rubber Company and other domestic footwear manufacturers, a shoe patent, and laboratory test reports on footwear samples, as well as samples of the imported footwear and of domestic footwear manufactured by U. S. Rubber Company. In addition, appellant argued both before the trial court and here that appraisement of the involved merchandise on the basis of the American selling price formula is illegal, contending that the Protocol of Terms of Accession by Japan to the General Agreement on Tariffs and Trade T.D. 53865, concluded between the United States and Japan pursuant to the Trade Agreements Act abrogated the flexible tariff statute and customs treatment of merchandise such as that at bar, returning customs treatment of such imported merchandise to its earlier treatment which in this case is conceded to be paragraph 1530(e), Tariff Act of 1930.

In support of the appraised values the Government adduced the testimony of the New York examiner of merchandise, and an officer and employees of the United States Rubber Company with a view toward establishing that the imported footwear was similar to the "Rover" oxford and that the "Rover" selling prices conformed to the American selling price formula. The Government, the appellee here, also contends throughout that the statutory American selling price basis of valuation is the only proper basis for appraising the involved merchandise. The parties have also stipulated that should the courts determine that American selling price is not the proper basis for valuation of the footwear at bar, that the invoice prices represent the correct export value for this merchandise, and that there is no higher foreign value therefor.

On the instant record the court below sustained the appraised values. First, the trial court rejected appellant's contention that the Trade Agreements Act of 1934 rendered inoperative the Presidential Proclamation No. 2026 when the Japanese Trade Agreement, *supra*, became effective in 1955, stating (55 Cust. Ct. at page 647):

The broad purpose of the Trade Agreements Act of 1934 and its subsequent extensions (section 350(a) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1351, as amended) was to expand the foreign trade of the United States by permitting the President to enter into reciprocal trade agreements with other nations by which existing duties or import restrictions would be modified within the limits provided. Star-Kist Foods, Inc. v. United States (Bruno Scheidt, Inc., Party in Interest), 47 CCPA 52, C.A.D. 728 [275 F.2d 472]. Section 350(a) 2(a) was included in order that trade agreement concessions might not be nullified through the procedure provided in section 336. Existing proclamations would not have this effect since they would be known to the parties when trade agreements were negotiated and conditions under them would be the basis of negotiation. Where a rate of duty has been increased by a Presidential proclamation under section 336, it may be reduced by a trade agreement entered into under the authority of section 350(a), but if the trade agreement is terminated, the rate of duty reverts to that provided for in the Presidential proclamation. Barclay & Company, Inc. v. United States, 47 CCPA 133, C.A.D. 745. The section 336 proclamation is not abrogated by the trade agreement or the proclamation proclaiming it, but is merely suspended.

With respect to appellant's contention that the basis of appraisement here is

illegal, raised in the late trial stages, we are in agreement with the trial court's finding of legality. Apart from what the trial court had to say on the matter as hereinbefore noted, we are of the opinion that 19 U.S.C.A., section 1352(a), the pertinent portion of which reads:

> The provisions of section 1336 of this title shall not apply to any article with respect to the importation of which into the United States a foreign-trade agreement has been concluded pursuant to this part, or to any provision of any such agreement. * * *

addresses itself solely to the use of section 1336 as a *procedural device,* and that what is intended by the language above noted is the barring of the use of that statutory procedure in derogation of the operation of a trade agreement concluded pursuant to section 1351. To admit of the broad construction of section 1352 for which appellant contends would, in our view, require the addition of language to that above noted so as to make the statute applicable not only to the provisions of section 1336 of this title, but to make it also applicable to the customs treatment of articles pursuant thereto.

█ In any case, a construction of section 1352 as embracing prior proceedings and determinations made under section 1336 would seem to lead to redundancy. The obvious, if not avowed purpose of the Trade Agreements Act of 1934 as expressed in section 1351 is to empower the President to undo or nullify (at least temporarily) the tariff restrictions brought about by and resulting from the provisions of section 1336 among other things. Indeed, the extensive use of the Trade Agreements Act to this end to which both parties advert in the briefs attest to such purpose. Hence, Congress, having enacted legislation in section 1351 which enabled the President to effectively deal with restrictive tariff treatment of articles the subject of section 1336 (during the life of a trade agreement concession covering such articles), would, under appel-

lant's interpretation of section 1352, be deemed to have come back in the succeeding statute (section 1352) to deal with the same subject matter again. Or what is equally as bad as surplusage of language, is that under appellant's construction of section 1352 the efficacy of section 1351 trade agreement proceedings to affect existing section 1336 is non-existent or is left in doubt apart from the provisions of section 1352. An interpretation of section 1352 which leads to the inharmonious results which appellant's view invites is to be avoided over one that implements the legislative intent to broaden rather than restrict trade with foreign countries.

As we view the situation, section 1336 pertaining to canvas-rubber footwear of the type here involved effected only a change in the basis of valuation of such footwear, and not a change in the rate of duty assessable against such imported footwear. The subsequent section 1351 trade agreement pertaining to such merchandise effected only a modification of the duty rate on such footwear, and not a change in the basis of valuation. Hence, insofar as the impact of section 1351 upon section 1336 is concerned, it would seem following the reasoning of our appeals court in Barclay & Company, Inc. v. United States, 47 CCPA 133, C.A.D. 745, that section 1336 was at best only suspended, and this, *pro tanto* to the extent of the duty rate, leaving intact the basis of valuation of the merchandise affected by section 1336. In view of the bargaining limitations placed upon the actions of the trade negotiators perforce of section 1351, it is difficult to see how they could have effected a change in the basis of valuation of the subject merchandise within the framework of such limitations by their actions even if they were of a mind to do so. We are, therefore, under the circumstances attendant here, inclined to agree with appellee's argument that the trade agreement rate of duty constitutes an American selling price rate of duty within the meaning of section 402(a) (4), Tariff Act of 1930, as amended by the Customs Simplifica-

tion Act of 1956, since the trade agreement did nothing to abrogate the existing basis of valuation.

■ Moreover, we do not find any language in the Trade Agreements Act of 1934 which operates to regulate, prescribe, or circumscribe Presidential courses of action in negotiating trade concessions in bilateral or multilateral agreements within the expressed statutory limits, nor any prohibition therein against recognition by contracting parties to such trade agreements of the American selling price basis of valuation or any other basis of valuation as a circumstance in the negotiation of concessions.

■ In view of our determination, *supra*, and since the imported shoes have "uppers" composed of the specified material and appellant does not challenge the validity of the Presidential proclamation, except as heretofore determined, appraisement must be made under the provisions of section 402(g), *supra*, if all the elements are present. This, of course, is based upon the proviso that the domestic competitive article selected by the appraiser is like or similar to the imported article as required by section 336, *supra*. Such determination was made by the appraiser and his action under the law carries with it a presumption of correctness.

The question of whether an imported article is like or similar to a domestic article was before the court in Japan Import Co., Inc. v. United States, 2 Cust. Ct. 926, Reap.Dec. 4568, affirming 1 Cust.Ct. 607, Reap.Dec. 4389. The court therein set forth the following factors to be considered in making their determination:

1. Similarity of material
2. Commercial interchangeability
3. Adaptability to the same use
4. Competitive character

The record establishes and an ocular inspection of the imported article and the domestic shoe confirm similarity of material. Whether the cushioned inner-sole and shockproof arch cushion are recognized differences, we nevertheless feel they are legally "similar" within the purview of section 336, *supra*. The differences are not unlike those in Mutual Supply Co. v. United States, 14 Cust.Ct. 291, Reap.Dec. 6086, wherein the court stated: "They are the same in shape, in design, and practically the same in construction. Appellant points out that the presence of a strip of metal in the soles of the domestic shoe which tends to make it more rigid is an important point of dissimilarity." This phase was also discussed at length in the case of Albert F. Maurer Co. v. United States, 51 CCPA 114, C.A.D. 845. Of particular significance are the following pertinent observations made by the court:

In summary, it is quite clear that the imported and the American rubbers have many points of similarity and many points of dissimilarity. They both serve the same purpose, to keep the feet dry. They are made of substantially the same material. Both are flexible enough to fold up and stuff in a case or pocket. Though there is a measurable difference in hardness according to the evidence, it would not be apparent to the average customer.

The true question here, as we see it, is whether, in order to carry out the intent of Congress in enacting the flexible tariff law, section 336, we should affirm the holding that the Moderna and Tingley rubbers are legally "similar" notwithstanding their differences.

We must not lose sight of the basic fact that the purpose of the Presidential Proclamation of 1933, and the statutory purpose which it implemented, was protection of American manufacturers and labor from foreign price competition with respect to the goods named in the proclamation. Among those goods was "footwear, wholly * * * of india rubber * * *." The proclamation increased the tariff on such goods to 25% ad

valorem based upon the *American selling price of* "like or similar articles" made in the United States. Surely the underlying principle is to protect American manufacturers from foreign competition where foreign goods sufficiently "similar" to them to compete with them are imported. H. H. MacDonaugh & Co. v. United States, 38 CCPA 36, C.A.D. 436. If the collector can find no American article sufficiently similar to the one imported to create market competition with it, obviously no one is going to be disadvantaged, there is no point in applying the proclamation, and as a matter of law it would not apply. On the other hand, where imports are sufficiently similar to American goods to compete directly with them, and the goods are within a category named in the proclamation, it would seem to be within the intent of Congress that they receive the protection the proclamation was intended to afford. The whole scheme was to protect specified American manufactures whenever and if foreign competing merchandise came in by charging the latter with an ad valorem duty based on American selling price of the American-made protected articles, in the words of the statute itself, in order to "equalize the differences in the costs of production of the domestic article and the like or similar foreign article * * *."

In taking into consideration the basic purpose behind section 336, we do not give much weight to prior adjudications involving the meaning of the word "similar" as it is used in other provisions of the Tariff Act. The problem is one of economics, not semantics. It therefore serves no useful purpose and only creates confusion to discuss all the shades of meaning of the word "similar" or how it has been construed in other cases involving other sections of the statutes.

The principle that goods may be legally "similar" for the purposes of section 336 notwithstanding the existence of numerous differences has been established in prior decisions. Japan Import Co. v. United States, 24 CCPA 167, T.D. 48642.

We are of the opinion that the innersole and arch fall within the same category of differences.

Commercial interchangeability and adaptability to the same use may be considered together since it is obvious that in an article such as this commercial interchangeability would in fact be based upon use. Notwithstanding the difference in the soles of the two types of tennis shoes and the testimony of their use on clay tennis courts, we are of the opinion that the imported article and the "Rover" are commercially interchangeable and adaptable to the same use. The additional reasoning as set forth in the opinion below relative to price, quality, advertisement, and retail sales outlets are adopted in our finding of compliance with the determining factors as set forth, *supra,* including competitiveness of character which we additionally would add the testimony of the witnesses of the domestic producers of such shoes, who all felt such shoes are competitive. Hence, the provisions of section 336, *supra,* are met.

In view of the foregoing, appraisement must be made under the provisions of paragraph 402(g), *supra,* if such sales meet the requirements of said section, *supra.*

Section 402a(g) provides as follows:

The American selling price of any article manufactured or produced in the United States shall be the price, including the cost of all containers and coverings of whatever nature and all other costs, charges, and expenses incident to placing the merchandise in condition packed ready for delivery, at which such article is freely offered for sale for domestic consumption to all purchasers in the principal market of the United States, in the ordinary course of trade and in the usual wholesale quantities in such market, or the price that the manufacturer, producer,

or owner would have received or was willing to receive for such merchandise when sold for domestic consumption in the ordinary course of trade and in the usual wholesale quantities, at the time of exportation of the imported article.

In the *MacDonaugh* case, *supra*, involving the same proclamation and type of merchandise, the court made the following statement:

> There are really two definitions. The first embraces the phrase "freely offered for sale," which long has been used in tariff acts in defining (1) foreign value, (2) export value, and (3) United States value. (See paragraphs (c), (d), and (e) of section 402 of the Tariff Act of 1930.) The phrase as so used has been construed often and need not be discussed here.

> The second definition is alternative. It is embraced in the clause reading, "or the price that the manufacturer, producer, or owner would have received or was willing to receive for such merchandise when sold in the ordinary course of trade and in the usual wholesale quantities, at the time of exportation of the imported article."

So far as we have been able to ascertain, the last clause quoted appeared for the first time in section 402(f) of the Tariff Act of 1922. Obviously, it is a very broad provision, evidently inserted to supplement the first provision in a manner favorable to domestic industries.

\*  \*  \*  \*  \*  \*

Certainly all the pertinent testimony of Pennington and other witnesses is to the effect that the United States Rubber Company would have been "willing to receive" the list prices of the shoes (allowing discounts as is customary in business transactions) "sold in the ordinary course of trade and in the usual wholesale quantities, at the time of exportation of the imported article."

It is apparent that the alternative definition as set forth in section 402a(g) does not require that the domestic merchandise must be freely offered, etc., but only that there be a price which the manufacturer, producer or owner would have received or been willing to receive.

■ Since the method of appraisement under said section 402a(g) is alternative in the event the primary method cannot be established or been shown not to exist, it is nevertheless incumbent upon the party challenging a presumptively correct appraisement to also negate the alternative existence of American selling price. Hudson Shipping Co., Inc. v. United States, 43 CCPA 19, C.A.D. 604.

We are of the opinion that the merchandise is freely offered for sale to all purchasers at wholesale in the ordinary course of trade. The record herein establishes that price lists are circulated in the trade and merchandise is in fact sold to retailers and two wholesalers while not being sold to other wholesalers or discount houses. This situation is not unlike the facts that existed in the *MacDonaugh* case, *supra*, where the court said:

> From Pennington's testimony, it is apparent, we think, that the company which he represented was not actually *trying to sell*, in the region of which San Francisco was the principal market, shoes of the type here involved to any concerns other than retailers. In all the Pacific Coast region the company had just one jobber customer. It was located at Sacramento, California. There were other jobbers in the region. There is no evidence showing that salesmen called upon such jobbers, or that their patronage was sought by mail, or in any other manner, but, on the other hand, there is no evidence that any jobbers ever sought to become customers, or that the United States Rubber Company ever received an offer from any concern to purchase which it refused.

Certainly all the pertinent testimony of Pennington and other witnesses is to the effect that the United States Rubber Company would have been "willing to receive" the list prices of the shoes (allowing discounts as is customary in business transactions) "sold in the ordinary course of trade and in the usual wholesale quantities, at the time of exportation of the imported article." [Emphasis quoted.]

The record also establishes that sales to retailers in the ordinary course of trade were at list prices less 2 per centum except at certain times of the year when different seasonal discounts were allowed and special discounts were allowed the two wholesalers. While the record is meager on the question of usual wholesale quantity, we are of the opinion that this is sufficient evidence adduced to establish said quantity to be between 12 pairs and 480 pairs. The record indicates all such sales are at list price less 2 per centum which is basically, according to the record within the exception of seasonal discounts and wholesaler discount, the manner in which all sales are made. With respect to the principal market, the testimony of Mr. Anastasio, General Sales Manager, Consumer Goods, Footwear Division United States Rubber Company, establishes to our satisfaction that New York City is the principal market.

In any event since the alternative method of appraisement under American selling price does not necessitate compliance with the requirement in the primary portion of section 402a(g) and since if the party contesting the appraisement is able to eliminate the primary requirement, it still has the burden of negating the existence of American selling price. Under the alternative method, the importer has clearly failed to meet its burden of proof. The record herein clearly establishes, not only that the manufacturer selected, United States Rubber Company, but Bata Shoe, B. F. Goodrich, Bristol Manufacturing, and Tyer Rubber Company, all produced footwear which they considered comparable. Whether or not these firms met the primary requirements of section 402a(g), they did establish the prices they would be willing to receive which complies with the ultimate requirements of said section 402a(g).

The dissenting opinion brings to our attention that merchandise covered by appeal R61/6166 contains no notation of appraisement. A review of these entry papers does indicate that no notation of appraisement is contained therein with respect to tennis shoes. All other items covered by the invoice appear to carry the appropriate notation of appraisement and the reverse side of the "Summary of Entered Value," customs form 6417, contains the signature of the acting deputy appraiser indicating appraisement. Since the entry was deemed appraised by the designated official, we must assume since no advance was made that the appraisal was as entered. This is, of course, based on the premise that a government official is presumed to have acted in accordance with the law. United States v. C. O. Mason, Inc., etc., 51 CCPA 107, C.A.D. 844. The record having established the proper value to be the prices reflected in the price list for the "Rover," the value of said merchandise is as reflected therein.

It is to be noted, as pointed out in the dissenting opinion, that in a number of entries the appraised value differed from the price list of U. S. Rubber. Former footwear examiner, Alexander, indicated the appraisement was made "by all reasonable ways and means." This is not a unique situation and in fact is sanctioned by law.[1]

1. Section 500, Tariff Act of 1930:
   To appraise the merchandise in the unit of quantity in which the merchandise is usually bought and sold by ascertaining or estimating the value thereof by all reasonable ways and means in his power, any statement of cost or cost of production in any invoice, affidavit, declaration, or other document to the contrary notwithstanding.

Upon the record here presented the court finds as facts:

1. That the merchandise involved herein consists of so-called tennis oxfords, having uppers wholly or in chief value of cotton and soles wholly or in chief value of rubber, exported from Japan during 1958, 1959, and 1960.

2. That the imported merchandise was of the class or kind described in Presidential Proclamation No. 2027, dated February 1, 1933, 63 Treas.Dec. 232, T.D. 46158.

3. That the imported merchandise was of the kind described in paragraph 1530(e), Tariff Act of 1930, as modified by the Protocol of Terms of Accession by Japan to the General Agreement on Tariffs and Trade, T.D. 53865.

4. That the imported merchandise was appraised on the basis of the American selling prices of a circular vamp oxford produced by the United States Rubber Company, called the "Rover," a style in the line sold under the registered brand name "U.S. Keds."

5. That the Rover and the imported merchandise had a similar appearance, were made of similar material, were of similar construction, had substantially the same uses and purposes, and would compete for purchase by many of the same persons. That the Rover was heavily advertised and the imported article was not; that the Rover was somewhat superior in durability and sold at a higher price; that the channels of distribution were substantially but not completely different.

6. That, in the ordinary course of trade, the Rover was freely offered and sold only at list prices, less 2 per centum, the price not varying according to the quantity purchased, except for a surcharge of 50 cents for a purchase under 12 in quantity. That most sales were to retailers. That no additional discount was offered to wholesalers or jobbers, except for two in a restricted category. That factory makeup discounts were allowed for orders accepted from August 1 through December 31, for shipment December 1 through April 25, and quantity discounts for at-once orders of 480 pairs or more in case lots of 1 item.

7. The principal market of said merchandise is New York City.

8. That the manufacturer received or was willing to receive for the Rover, when sold in the ordinary course of trade and in the usual wholesale quantities at the time of exportation of the imported article, the list prices, less 2 per centum, which prices were equal to the appraised values.

9. That the merchandise covered by appeal R61/6166 was appraised as entered no notation by the appraising officer appearing on the entry.

The court therefore concludes as matters of law:

1. That Presidential Proclamation No. 2027 has not been abrogated or suspended by the modification of paragraph 1530(e), Tariff Act of 1930, by the Protocol of Terms of Accession by Japan to the General Agreement on Tariffs and Trade, T.D. 53865.

2. That the proper basis for determining the values of the imported merchandise is the American selling price, as defined in section 402a(g), Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, 70 Stat. 943.

3. That the U.S. Keds "Rover" is similar to the imported merchandise.

4. That the American selling prices of the U.S. Keds "Rover" were those found by the appraiser.

5. That the dutiable values of the imported merchandise are the appraised values.

Judgment will be entered accordingly.

RICHARDSON, Judge (dissenting in part):

While I fully subscribe to the views expressed by the majority in arriving at the conclusion that it was not illegal for the appraisers to undertake the appraisement of the merchandise at bar under the American selling price formula, I cannot subscribe to the majority's view that

the instant record supports the appraisements returned herein under that formula and upheld by the court below, and accordingly, I am constrained to dissent from that phase of the majority's disposition of the instant application for review.

With respect to the matter of "similarity" between imported footwear and comparable domestic counterpart footwear—the foremost point to be considered under the American selling price valuation formula—it should be borne in mind that Congress may prohibit the importation of specified merchandise altogether, it may permit its importation only on a quota basis, or it may impose guidelines for the importation of competitive merchandise which it feels are adequate to protect American industry and labor. In this case Congress laid down certain guidelines—the American selling price of similar [1] domestic counterparts of the imported shoes, if there be any. The appellant, on the record made in this case, has shown that the imported shoes are not "sufficiently similar" in construction to the domestic counterpart shoes placed in evidence to create competition with them. "Sufficiently similar" means that the imported shoes must be commercially acceptable substitutes for the counterpart shoes. There is substantial evidence in this case that they are not.

The court below said very little in its analysis of the differences and similarities between the "Rover" shoe and the imported shoe relative to the cushioned insole and shockproof arch cushion which United States Rubber Company added to the "Rover" line and which is mentioned in the manufacturer's price list effective August 1, 1959. This cushioned insole and shockproof arch cushion, which has the feel of foam rubber under a fabric covering, is shown in exhibit 1–F, but no such features are contained in the "Rover" designated as exhibit 6. Appellee's counsel conceded at the trial that the "Rover" of 1958 (ex-

hibit 6) did not possess such features, while the "Rover" of 1959 and 1960 (exhibit 1–F) did possess these features (R.182–185). In the case of the imported shoe, a type of foam rubber fabric-covered insole with built in arch support is contained in exhibit 3, but no such cushioned insole is contained in exhibit 9, although the insole of exhibit 9 does have the built in arch support.

It thus appears that both the domestic "Rover" shoe and the imported shoe were made with and without cushioned insoles, and in the case of the "Rover," with and without shockproof cushioned arch support. There is, however, one important difference between the "Rover" shoe and the imported shoe with respect to the feature of the cushioned insole. In the case of the imported shoe, both types of shoes (that is, shoes with and without cushioned insoles) were brought in *concurrently* by the appellant in 1959. However, with respect to the "Rover" shoe, the cushioned insole shoe came into existence in replacement of the non-cushioned insole shoe, with the changeover occurring *in 1959*, the year in which the merchandise at bar was exported from Japan.

In the instant record it appears that appraisement of the imported shoes *without* cushioned insoles was undertaken by the measure of a "Rover" shoe *with* a cushioned insole and shockproof arch cushion, and *vice versa*, with varying results between the involved appraisers. Under entry 961416 of appeal R60/20082 covering cushioned insole footwear identified on the invoice as Art. No. 74025 and exported on March 20, 1959, it appears that the appraiser at New York used a "Rover" price (exhibit 4, page 6) for a non-cushioned insole "Rover" shoe in returning *values* for children's, juniors', and women's sizes (listed at $2.05, $2.20, and $2.45, respectively) at $2.10, $2.25, and $2.50, respectively. In apparent explanation for this method of appraisement under the American selling price formula the examiner, Abraham

1. No contention is made that the imported footwear is "like" the domestic footwear.

Alexander, testified at the trial (R.210), " * * * we had to go by all reasonable ways and means at the time or it would have taken a thousand men to do it." But under entry 836749 of appeal R61/6166, also a New York entry, it appears that the appraisement in a multiple item return did not reflect any price or *value* at all [2] for the non-cushioned insole canvas-rubber shoes exported from Japan on September 30, 1959—the then appropriate "Rover" list price being only for cushioned insole and shockproof arch cushioned shoes (exhibit 7, page 5.)

Under entry 38432 of appeal R59/18530 covering non-cushioned insole footwear identified on the invoice as Art. No. K–12782 and exported on May 31, 1959, it appears that the appraiser at San Francisco used a "Rover" price (exhibit 7, page 5) for a cushioned insole "Rover" shoe in returning a *value* for juniors' sizes (listed at $2.40) at $2.35 per pair, less 2%, packed. It is noted that this merchandise was exported May 31, 1959, and the appraiser at San Francisco made his appraisement September 15, 1959 on the basis of a "Rover" price list effective August 1, 1959, which was the first time the United States Rubber Company added cushioned insole and shockproof arch cushion shoes to its line. 19 U.S.C.A., section 1402(g) requires the appraiser to use a domestic selling price in effect on the date of exportation. His having used a price not effective until sixty days after the date of exportation is not a compliance with the statute.

Under entry 5351 of appeal R60/16359 covering both cushioned insole and non-cushioned insole footwear, identified on the invoice as Art. No. 74025 and Art. No. K–12782, respectively, and exported on August 15, 1959, it appears that the appraiser at Baltimore used a "Rover" price (exhibit 7, page 5) for a cushioned insole "Rover" shoe in returning prices for both items in children's, juniors' and women's sizes (listed at $2.20, $2.40, and $2.65, respectively) at list prices, less 2%, packed.

Thus, with the exception of canvas-rubber footwear described on the invoice under the aforementioned Baltimore entry, the merchandise at bar was either not appraised, or if appraisement thereof was attempted under the American selling price formula, was not appraised at prices reflecting actual American selling prices, but was assigned what amounts to so-called "all reasonable ways and means" values. And it would appear that this phenomenon is attributable to the variation in the insole and arch support components of the shoes undergoing comparison for appraisement purposes. There is no question about the authenticity or accuracy of the actual prices listed by U. S. Rubber Company for the counterpart domestic shoes here involved, governing the periods of the subject exportations (R.211, 257). The footwear identified under Art. No. 74025 on the invoice of the said Baltimore entry was appraised at these actual list prices, and on an imported article matching the domestic counterpart article component-wise in a degree in which the other imported articles here involved did not.

I also note from the involved invoices that the difference in composition of the insole is reflected in the invoice pricing of the imported shoes in the country of exportation, as well as in the appraisement practices heretofore commented upon with respect to the entries at bar— the practice indicating the extent to which the difference in insole influenced

---

2. Section 14.2(t) of the Customs Manual as amended September, 1958, by amendment number 585 required a check mark in the "Appraised" column on customs Form 6417 in order to effect an appraisement of merchandise "as entered" and as the majority opinion indicates there is no check mark on the entry paper. But an appraisement as entered operates in direct contradiction of the majority opinion's conclusion as to American selling price appraisements in this case. An appraisement "as entered" with respect to the canvas-rubber shoes of this particular entry would leave in effect the Japanese export value prices which are set forth in the invoice covered thereby.

the thinking of the exporters as well as the appraisers with respect to prices and values. Of course, appraisement here on the basis of American selling prices cannot properly proceed upon the judgments of appraising officers as to value in substitution of actual domestic prices. For any extension of the so-called "all reasonable ways and means" concept here in the manner indicated in the majority opinion, that is, by substituting constructive values in the place of actual prices, would be in plain derogation of the statutory mandate to the appraiser to value the merchandise in terms of "prices."

Also, mention should here be made of the fact that witnesses whose testimony is relied upon by both parties herein appear to have recognized the significance of variation in insole and arch support features in the shoes in question. Mr. Albert Zerkowitz, president of plaintiff corporation, testified on cross-examination by Government counsel (R.17):

THE WITNESS: Exhibit 9 is a cheap shoe without any cushion insole, without any arch support, not suitable for people who are accustomed to wear shoes with cushion insole and with arch support. Somebody wears one type of shoe or another type of shoe.

And Joseph Anastasio, a U. S. Rubber Company footwear division general sales manager, testified (R.724):

Q. In your opinion, is a shoe with shockproofed arch, and cushioned inner soles, superior to a shoe without these features?—A. In my opinion, yes.

Mr. Anastasio had previously testified that such features make a shoe more comfortable (R.723).

I am satisfied that the instant record, reinforced by an inspection of the samples at bar, compels the conclusion that the cushioned insole and shockproof arch cushion add a measure of support and comfort to the wearer of a shoe so equipped (the Rover) which are not afforded to the wearer of a shoe without these features (the imported shoe). And it can scarcely be debated that support and comfort are the prime requisites of footwear. Consequently, I am of the opinion that the presence or absence, as the case may be, of the cushioned insole and shockproof arch cushion in the footwear under comparison here makes a decided difference in the comparability status of the compared footwear even if the other factors discussed by the court below do not.

I am not unmindful of statements made by our appeals court in Albert F. Maurer Co. v. United States, 51 CCPA 114, C.A.D. 845, to which attention is called in the majority opinion herein on the matter of "similarity" in American selling price valuations. The record in this case is not at odds with what I find to be salutary·policy considerations mentioned in the Maurer case. However, an awareness of a policy to protect domestic industry and labor where imported goods are competitive with similar domestic merchandise does not require a finding of similarity within the meaning of the statute merely because the foreign and domestic items fall within the same broad use classification. For example, a Ford Falcon and a General Motors Corp. Cadillac are both automobiles, but they are far from being similar in construction.

Likewise, the imported articles and the domestic counterpart articles here involved are both shoes of the canvas-upper and rubber-soled variety. But the noted differences in component parts in the domestic shoes, i. e., shockproof arch and cushioned insole, providing a firmer and more comfortable fit, make them substantially different from the imported shoes—a difference which is accentuated by a wide price disparity of approximately 200% (i. e., $2.05 for the domestic shoe as against 60 cents for the imported shoe).

Also, it is to be noted that the Maurer case points out that the difference with

which the court in that case was dealing as between the imported article and the domestic counterpart article was one which would not be apparent to the average customer. However, in the case at bar no such subtle or unnoticeable difference marks the cleavage between the opposing articles. In fact, the aforementioned differences in construction, comfort and price between the articles at bar are so sufficiently pronounced as to make the articles non-competitive.

Therefore, on the matter of "similarity" alone, the evidence of record militates against such a finding in my judgment. And in any case, with the notable exception of the footwear covered by appeal R60/16359, the failure of the appraisers herein to either appraise the imported footwear or to return actual American selling prices therefor voided appraisement of such footwear under the American selling price formula, in which cases judgment should be rendered here in accordance with the stipulated values in lieu of remand to a single judge for value determinations.

Even though appraisement of the merchandise covered under appeal R60/16359 is not "void' because made in terms of "actual" American selling prices, and even if the footwear described under Art. No. 74025 on the invoice in said appeal can be said to be "similar" to the "Rover" shoe because such footwear matches the domestic counterpart shoe component by component in a degree that the other shoes under said entry do not, the other criteria under the American selling price formula must be considered in connection with appraisement of the merchandise of said appeal.

With respect to the merchandise of appeal R60/16359, I cannot agree with the majority's conclusion that the "Rover" shoe was *freely offered* for sale to all purchasers, *including wholesalers*, at list prices, less 2% cash discount. I think a fair appraisal of the evidence bearing on the point leads to the opposite conclusion, namely, that the domestic manufacturer of the "Rover" shoe refused to sell that and other of its label shoes to wholesalers generally. In answer to a question posed by appellant's counsel as to whether U. S. Rubber Company would sell to wholesalers at a 2% discount, the company's footwear division general sales manager, Mr. Anastasio, testified that the company's present policy was not to sell to wholesalers at all (R. 259–261). And it was brought out in the court's questioning of that witness and of Harold N. Barrett, vice president and general manager of the footwear and general products division of said company, that the company's *present policy* period dated back to around 1940, so as to cover the period at issue here (R. 275–298).

And it appears that wholesalers were a class of persons who handled such merchandise. Herman Cohen and Hyman Zamkoff, shoe wholesalers, testified that although they handled domestically made canvas-rubber footwear made by companies such as Bata Shoe Company and Converse Rubber Company, they were not able to or did not handle the canvas-rubber footwear of U. S. Rubber Company. Mr. Zamkoff gave the reason as being because U. S. Rubber Company did not sell to jobbers (R. 147–148). Such evidence of exclusionary practices was not before the court in H. H. MacDonaugh & Co. et al. v. United States, 38 CCPA 36, C.A.D. 436, on which the majority rely to reach the conclusion they do on the subject of free offerings.

On the matter of "usual wholesale quantity" for the "Rover" shoe, the record shows, disregarding the seasonal and special discounts, that there were at the pertinent times here involved three year round *wholesale quantities,* namely, 1 or more pairs up to 12 pairs, 12 or more pairs up to 480 pairs, and 480 or more pairs, that offering prices varied according to quantities purchased within the aforementioned categories, that the price in the first category was list price,

less 2% cash, plus 50¢ service charge, the price in the second category was list price, less 2% cash, and that the price in the third category was list price, less 8%, less 2% cash.

The majority opinion states that the record is "meager" but "sufficient" on the subject of usual wholesale quantity. I think this assessment is generous. There is no evidence of a single transaction involving offerings or sales made of the "Rover" shoe by U. S. Rubber Company at any time, although appellant's counsel pressed continuously for answers on this point from the appraising officers and key personnel connected with U. S. Rubber Company who testified in this case. An "opinion" was ventured by Mr. Barrett to the effect that about 60 percent of his company's sales were made in quantities below 480 pairs. But there is nothing in this witness' testimony to indicate that he was talking about anything other than total company products. So that the result is, while we have evidence of three distinct wholesale quantities, we have no evidence of the usual wholesale quantity which characterized U. S. Rubber Company's offerings and sales of *the "Rover" shoe* at the pertinent times.

By the same token the dearth of evidence of offerings or sales of the "Rover" footwear precludes any finding as to location of the principal market in the United States for the sale of such footwear, notwithstanding the New York appraiser's belief that the location of the principal market for such footwear in New York is a matter of common knowledge. The record shows that the source of said appraiser's belief as to location of principal market stems from a 1933 customs bureau report which, as is manifest in the testimony of witnesses herein, has been supplemented or updated by little or no customs investigation of contemporary market conditions. There is a woeful lack of information in the record regarding specific offerings, sales, and volume of business in the "Rover" line of footwear in any domestic market, emanating from the appraising officers who testified and from the U. S. Rubber Company personnel who also testified and through whom said appraising officers must necessarily obtain such information insofar as that company's participation in the canvas-rubber footwear market is concerned. In fact, neither of the New York examiners who gave testimony seemed aware of the fact that the "Rover" shoe was not made in men's sizes as of the times in question. For both of these witnesses testified that the "Rover" shoe was made in men's sizes (R.190, 211), when in fact the admittedly genuine price lists in evidence clearly show that a man's shoe was non-existent in the "Rover" line.

And I certainly am not impressed with the testimony of Mr. Anastasio, U. S. Rubber Company's sales manager, on the matter of location of the principal market in New York City. On cross-examination on this subject by plaintiff's counsel Mr. Anastasio testified that he didn't believe his company had ever had a specific figure on the number of sales or transactions of the Rover type shoe confirmed by the New York district office (R.263–264), that he hadn't the "foggiest notion" of the volume of Rover type shoes sold in each of the company's district sales offices in 1958, and that he didn't know who in the company had the answer, although in an earlier deposition this witness had said that he as much as anybody in the company would be in a position to supply these "statistics" (R.272, 737–738).

The location of a principal market is a matter requiring common law proof in a court of law such as the Customs Court. And the court cannot take judicial notice of such a controversial item as is the question of location of a principal market. It is impossible for the court to make a finding here as to location of the principal market absent evidence of where the major portion of sales or offers of "Rover" footwear were made at relevant times in conformity to

the statute. Cf. Adolph Goldmark & Sons Corp. v. United States, 22 CCPA 358, 362, T.D. 47378; Innis, Speiden & Co. et al. v. United States, 19 CCPA 1, 7, T.D. 44789. And a presumption as to location of principal market cannot be indulged here since the appraising officers and the manufacturer of the counterpart shoe have given evidence of being without the knowledge and information on which such a presumption could rest.

Therefore, on the state of the instant record, I am of the opinion that appraisement of the merchandise even under appeal R60/16359 is found wanting *vis-a-vis* the requirements of the primary definition of American selling price in 19 U.S.C.A. section 1402(g) (section 402a(g), Tariff Act of 1930, as amended by the Customs Simplification Act of 1956).

Insofar as the secondary definition of American selling price under section 1402(g) is concerned, its criteria is simply not applicable to appraisement of the imported footwear covered by appeal R60/16359 (or any of the other appeals herein for that matter) on the basis of a comparison of the domestic counterpart shoe utilized in the appraisement, namely, the "Rover." In general, the alternate definitions of section 1402(g) are not intended to apply in the same case, but are intended to govern different cases. Cf. Aceto Chemical Co., Inc. v. United States, 51 CCPA 121, 127, C.A.D. 846. And in particular, the second definition of American selling price under section 1402(g) is excluded from applicability here because the merchandise with which we are concerned consists of consumer goods that are sold under open market conditions and thus adaptable to consideration under the primary definition, whereas the second definition of section 1402(g) is addressed to producers' goods which are not sold under open market conditions, but are used by the producer to manufacture other marketable goods. See the incisive discussion on the point in Hudson Shipping

Co., Inc. v. United States, 43 CCPA 19, 28–29, C.A.D. 604.

Both the *Hudson Shipping Co.* case and the *MacDonaugh* case deal with the second definition of section 1402(g), and are in apparent conflict on the point. The majority have relied on the *McDonaugh* case. Be that as it may, it is only fair to point out that the *Hudson Shipping Co.* case was decided by our appeals court five years after it decided the *MacDonaugh* case. And in cases of apparent conflict in the construction of a statute, as would seem to be the case here, it is proper for a lower court to adopt the latest construction of that statute which is made by the appellate court. The majority opinion fails to observe such amenity here. And this omission takes on added significance in view of the statement made by our appeals court in *Hudson Shipping Co.* (pp. 28–29): " * * * This court has never had a case before it when it could *fully* consider the meaning of this part of section 402(g)." [Emphasis supplied.]

This brings me to the question of the extent to which the presumption of correctness attaching to the appraisement extends with respect to the presumed existence of a domestic comparability standard with which imported merchandise is to be compared for the support of an American selling price valuation. Both the court below and the majority here have taken the position that appellant was required to and failed to negative the existence of comparable domestically produced footwear other than the counterpart footwear selected for appraisement purposes in the cases at bar. Appellant is not required to do so on the record in this case.

I fully agree with the majority that customs officers are presumed to have discharged their duties in accordance with law. And such consensus would not, on the facts of this case, require the court to go beyond the findings of these customs officers as to what merchandise is considered to be similar to the im-

ported merchandise, and presume that there is other merchandise which is also similar to the imported merchandise.

A proper discharge of the appraisers' statutory duty here would require a consultation by the appraising officers of representative sampling and inspection of domestic articles believed to be like or similar to the imported article, as a prelude to the selection of the domestic article to govern valuation of the imported article, if any such like or similar domestic article be found. And the appraisers' selection of a particular domestic article for such purposes would seem to imply their rejection of other domestic articles, at least in the absence of a selection of alternative counterpart articles. This appears to be what the New York appraising officer did in the instant case. Mr. Alexander, the examiner who passed upon the involved New York importation, testified on direct examination by Government counsel (R. 239–240):

Q. In your duties as a customs examiner when a shoe such as Exhibit 9 is presented to you for value purposes will you explain to the court what you do to determine the dutiable value and to advise the appraiser as to your opinion as to the dutiable value?—A. Exhibit 9?

Q. Yes, the red shoe.

\* \* \* \* \* \*

Q. What do you do?—A. I go to, or have gone—we have samples in our office of the shoes of many of the American manufacturers, of their basic shoes and other types of sneakers, oxfords, high-cut basketball shoes, calendered soles, molded soles. If we have knowledge from previous investigations of those samples we look and see which one it's similar to of one of the manufacturers.

\* \* \* \* \* \*

A. . . . Excuse me, I do. I do the things that I have spoken of. Then we take that price.

Similar conduct on the part of an appraising officer pursuing an American selling price valuation at the port of New York was adverted to (and presumably deemed *apropos*) by our appeals court in upholding the appraiser's domestic counterpart article selection in Japan Import Co. v. United States, 24 CCPA 167, 174, T.D. 48642. In that case the appeals court stated (page 174):

It appears from the testimony of the examiner, Gold, that in ascertaining American selling price the witness made investigation in the branch houses of Hood Rubber Co., Firestone Rubber Co., United States Rubber Co., and Cambridge Rubber Co., and that he found "certain similarities" existing between the imported articles and the articles produced by those companies. Samples of the imported merchandise were introduced in evidence, and are known as Collective Exhibit 3. These are a pair of canvas-topped shoes, of the "lace-to-toe" type, with rubber soles, and reinforcement of various portions of the toe and canvas tops with rubber pieces.

\* \* \* \* \* \*

Samples of the domestic goods with which comparisons were made were introduced in evidence and were before the court below and this court. \* \*

Here, in view of the uncontroverted evidence of polarization on the matter of comparability at the administrative level around the "Rover" shoe of U. S. Rubber Company manufacture, to suggest that appellant must search elsewhere to negative the existence of comparability would be to question the thoroughness of the appraisers' research in sampling the canvas-rubber footwear industry. In view of the requirements of 28 U.S.C.A., section 2633, the reappraising court does not try the validity of the appraisement *de novo*. The appraisement is statutorily presumed to be correct, and a challenging party is not required to quarrel with phases of an appraisement with which he is in accord. And if I understand ap-

pellant's position correctly, it is not that the appraisers' comparability studies are faulty insofar as depth or breadth of coverage is concerned, but that their selection of a counterpart shoe is otherwise in error, and as such, constitutes no support for an American selling price appraisement under section 1402(g).

We are not here dealing with an American selling price founded upon a statute (i. e., coal tar products) mandating that basis of valuation for imported merchandise, as was the court in the *Hudson Shipping Co.* case, where elimination of any similar competitive domestic product other than the appraiser's selection was deemed by our appeals court to be a prerequisite to the use of another basis of valuation. In the case at bar American selling price obtains, if at all, by virtue of Presidential proclamation only. But for such proclamation the merchandise at issue would be valued on the basis of one of the valuation bases set forth in the statutes other than American selling price.

In American selling price cases based on a proclamation this court has consistently taken the position that an importer challenging an American selling price appraisement is entitled to establish a value for imported merchandise on a valuation basis other than that used in the appraisement, upon a showing that the domestic counterpart article relied upon by the appraiser is improper. Mutual Supply Co. v. United States, 5 Cust. Ct. 614, Reap.Dec. 5062; Japan Import Co. v. United States, 1 Cust.Ct. 607, Reap.Dec. 4389, affirmed in 2 Cust.Ct. 926, Reap.Dec. 4568; Mitsubishi Shoji Kaisha, Ltd. v. United States, 1 Cust.Ct. 728, Reap.Dec. 4444, affirmed on the question of comparability of the shoes in 2 Cust.Ct. 935, Reap.Dec. 4570; K. Samura Shoten, Ltd. v. United States, 1 Cust.Ct. 713, Reap.Dec. 4437; Pacific Trading Co. v. United States, 3 Cust.Ct. 580, Reap.Dec. 4649; Bata Shoe Co. v. United States, 73 Treas.Dec. 1600, Reap. Dec. 4330; New York Merchandise Co., Inc. v. United States, 73 Treas.Dec. 1480, Reap.Dec. 4279. And see to the same ef-

fect, Mutual Supply Co. v. United States, 18 Cust.Ct. 338, Reap.Dec. 6809, reversed on other grounds on the issue of comparability in 20 Cust.Ct. 418, Reap. Dec. 7578, affirmed in 38 CCPA 44, C.A.D. 437. And it appears that our appeals court is inclined to the same view in proclamation cases. Mutual Supply Co. v. United States, supra (C.A.D. 437); Japan Import Co. v. United States, supra. In the last cited case, our appeals court, in coming to grips with the issue in the case, stated (page 175):

Under the proclamation of the President and said section 336(a) and (b), the appraisement of the imported goods was to be made at the American selling price of the domestic article like or similar to imported foreign articles, as defined by said section 402 (g). *Were the imported goods like or similar to the goods used by the appraiser in ascertaining value?* * * [Emphasis supplied.]

I believe that had our appeals court in Japan Import Co. v. United States, *supra*, been of the opinion that more was required to successfully challenge the appraisement in that case it would have said as much. Therefore, in view of the foregoing authorities and considerations, I conclude that appellant was under no duty to adduce any other evidence on the subject of domestic counterpart shoes other than that which was necessary to overcome the validity of the appraisers' selection and valuations. Appellant, having done that, and there existing in the record a basis for valuation of the involved merchandise, including merchandise covered by entries where appraisement was "void" for reasons herein stated, export value as stipulated by the parties should have been adopted by the court below as the basis for reappraisement of the subject merchandise.

For the reasons stated, I would reverse the judgment of the court below and enter the judgment which should have been entered by that court as per stipulation of the parties, in the event that the American selling price basis of valuation is not applicable.